COUSINS ET AL. *v.* WIGODA ET AL.

No. 73–1106.   Argued November 11, 1974—
Decided January 15, 1975

478

BRENNAN, J., delivered the opinion of the Court, in which DOUG-
LAS, WHITE, MARSHALL, and BLACKMUN, JJ., joined. REHNQUIST,
J., filed an opinion concurring in the result, in which BURGER, C. J.,
and STEWART, J., joined, *post*, p. 491. POWELL, J., filed an opinion
concurring in part and dissenting in part, *post*, p. 496.

*Wayne W. Whalen* argued the cause for petitioners.
With him on the briefs were *John R. Schmidt, Douglas
A. Poe, Robert L. Tucker,* and *John C. Tucker.*

*Jerome H. Torshen* argued the cause for respondents.
With him on the brief were *Lawrence H. Eiger, Earl L.
Neal,* and *Gayle F. Haglund.**

MR. JUSTICE BRENNAN delivered the opinion of the
Court.

At the March 1972 Illinois primary election, Chicago's
Democratic voters elected the 59 respondents (Wigoda

---

*\*Joseph L. Rauh, Jr., John Silard,* and *Elliott Lichtman* filed a
brief for Americans for Democratic Action et al. as *amici curiae*
urging reversal.

delegates) as delegates to the 1972 Democratic National Convention to be held in July 1972 in Miami, Fla. Some of the 59 petitioners (Cousins delegates) challenged the seating of the Wigoda delegates before the Credentials Committee of the National Democratic Party on the ground, among others, that the slate-making procedures under which the Wigoda delegates were selected violated Party guidelines incorporated in the Call of the Convention. On June 30, 1972, the Credentials Committee sustained the Findings and Report of a Hearing Officer that the Wigoda delegates had been chosen in violation of the guidelines,[1] and also adopted the Hearing Offi-

---

[1] The Hearing Officer found violations of Guidelines A–1 (minority group participation), A–2 (women and youth participation), A–5 (existence of party rules), C–1 (adequate public notice of party affairs), C–4 (timing of delegate selection), and C–6 (slate-making). Findings and Report of Cecil F. Poole, Hearing Officer (June 25, 1972). Guideline C–6 was as follows:

"C–6 Slate-making

"In mandating a full and meaningful opportunity to participate in the delegate selection process, the 1968 Convention meant to prohibit any practice in the process of selection which made it difficult for Democrats to participate. Since the process by which individuals are nominated for delegate positions and slates of potential delegates are formed is an integral and crucial part of the process by which delegates are actually selected, the Commission requires State Parties to extend to the nominating process all guarantees of full and meaningful opportunity to participate in the delegate selection process. When State law controls, the Commission requires State Parties to make all feasible efforts to repeal, amend or otherwise modify such laws to accomplish the stated purpose.

"Furthermore, whenever slates are presented to caucuses, meetings, conventions, committees, or to voters in a primary, the Commission requires State Parties to adopt procedures which assure that:

"1. the bodies making up the slates have been elected, assembled, or appointed for the slate-making task with adequate public notice that they would perform such task;

"2. those persons making up each slate have adopted procedures that will facilitate widespread participation in the slate-making

cer's recommendation that the Wigoda delegates be unseated and the Cousins delegates (who had been chosen in June at private caucuses in Chicago) be seated in their stead.

On July 8, 1972, two days before the Convention opened, the Wigoda delegates obtained from the Circuit Court of Cook County, Ill., an injunction that enjoined each of the 59 petitioners "from acting or purporting to act as a delegate to the Democratic National Convention . . . [and] from performing the functions of delegates . . . [and] from receiving or accepting any credentials, badges or other indicia of delegate status . . . ."[2]

---

process, with the proviso that any slate presented in the name of a presidential candidate in a primary State be assembled with due consultation with the presidential candidate or his representative.

"3. adequate procedural safeguards are provided to assure that the right to challenge the presented slate is more than perfunctory and places no undue burden on the challengers.

"When State law controls, the Commission requires State Parties to make all feasible efforts to repeal, amend or otherwise modify such laws to accomplish the stated purpose."

For comments on the development of the guidelines, see Schmidt & Whalen, Credentials Contests and the 1968 and 1972 Democratic National Conventions, 82 Harv. L. Rev. 1438 (1969); Segal, Delegate Selection Standards: The Democratic Party's Experience, 38 Geo. Wash. L. Rev. 873 (1970); Report of Commission on Party Structure and Delegate Selection: Mandate for Reform (1970), reprinted at 117 Cong. Rec. 32909 (1971).

[2] The injunction was obtained in a Circuit Court action filed April 19, 1972, by the Wigoda delegates against the Cousins delegates. In the interval between the filing of the suit and the action of the Credentials Committee on June 30, 1972, two proceedings occurred in the District Court for the Northern District of Illinois related to the suit. On April 20 petitioners removed the case to that federal court. On May 17 the case was remanded on the ground that there was no basis for federal jurisdiction. *Wigoda* v. *Cousins,* 342 F. Supp. 82. On June 30, the Court of Appeals for the Seventh Circuit, in an

Nevertheless when the Convention on July 10 adopted the Credentials Committee's recommendation and seated the Cousins delegates, they took their seats and participated fully as delegates throughout the Convention. In consequence, proceedings to adjudge petitioners in criminal contempt of the July 8 injunction are pending in the Circuit Court awaiting this Court's decision in this case.

The Illinois Appellate Court affirmed the injunction, 14 Ill. App. 3d 460, 302 N. E. 2d 614 (1973),[3] and the Supreme Court of Illinois, without opinion, on November 29, 1973, denied leave to appeal. The Appellate Court held that "[t]he right to sit as a delegate representing Illinois at the national nominating convention is governed exclusively by the Illinois Election Code," *id.,*

---

unpublished order, affirmed the remand. *Wigoda* v. *Cousins,* No. 72–1384.

While the remand issue was pending, petitioners filed their own action in the District Court for the Northern District of Illinois seeking an injunction against respondents proceeding with the Circuit Court suit on the ground that it violated their First Amendment rights. On June 9, after trial, a preliminary injunction issued barring respondents from proceeding with the state-court action. *Cousins* v. *Wigoda,* Civil No. 72C 1108. That injunction was reversed by the Seventh Circuit on June 29. *Cousins* v. *Wigoda,* 463 F. 2d 603. Petitioners' application to MR. JUSTICE REHNQUIST, Circuit Justice, for a stay of the Court of Appeals order was denied on July 1. 409 U. S. 1201.

[3] The Appellate Court also affirmed another injunction of the Circuit Court entered August 2, 1972, barring petitioners from participating as delegates at a post-convention caucus on August 5, 1972, to select the Illinois representatives to the Democratic National Committee to serve until the 1976 Convention. Petitioners complied with that injunction and respondents participated in the August 5 caucus. Since the National Committee plans the National Convention the question of the validity of the August 2 injunction is analytically indistinguishable from the question of the validity of the July 8 injunction, and our decision today applies to both injunctions.

at 472, 302 N. E. 2d, at 626, and rejected the Cousins delegates' contention that the injunction attempting to enforce that Code, by preventing them from participating as delegates at the Convention, violated their right, and the right of the National Democratic Party, to freedom of political activity and association assured them under the First and Fourteenth Amendments. The Appellate Court stated:

> "[T]he purposes and guidelines for reform adopted by the Democratic National Party in its Call for the 1972 Democratic National Convention ... in no way take precedence in the State of Illinois over the Illinois Election Code (Ill. Rev. Stat. 1971, ch. 46, § 7–1 *et seq.*). The opening section of Article 7 of the Election Code, which deals with the making of nominations by political parties (§ 7–1), is most clear when in discussing the selection of delegates to National nominating conventions, it states:
>
> " '... [D]elegates and alternate delegates to National nominating conventions by all political parties . . . shall be made in the manner provided in this Article 7, and not otherwise.' " *Id.,* at 471, 302 N. E. 2d, at 625.
>
> "[T]he law of the state is supreme and party rules to the contrary are of no effect. . . ." *Id.,* at 475, 302 N. E. 2d, at 627.
>
> "The interest of the state in protecting the effective right to participate in primaries is superior to whatever other interests the party itself might wish to protect. . . ." *Id.,* at 477, 302 N. E. 2d, at 629.
>
> "Since [respondents] were admittedly elected to the position of delegates to the 1972 Democratic National Convention by operation of the Election Code, an Illinois statute, this court finds the trial court's

injunctions did not abrogate [petitioners'] fundamental constitutional rights of free political association. . . ." *Id.,* at 479, 302 N. E. 2d, at 631.

We granted certiorari to decide the important question presented whether the Appellate Court was correct in according primacy to state law over the National Political Party's rules in the determination of the qualifications and eligibility of delegates to the Party's National Convention. 415 U. S. 956 (1974).[4] We reverse.

---

[4] We emphasize that this is the only question that we decide today. There are not before us in this case, and we intimate no views upon the merits of, such questions as:

(1) whether the decisions of a national political party in the area of delegate selection constitute state or governmental action, and, if so, whether or to what extent principles of the political question doctrine counsel against judicial intervention. Respondents concede, and we agree, that "[i]n the context of the instant case, it is not necessary to determine whether Convention action is 'state action' . . . ." Brief for Respondents 47. See *Brown* v. *O'Brien,* 152 U. S. App. D. C. 157, 469 F. 2d 563 (1972); *Georgia* v. *National Democratic Party,* 145 U. S. App. D. C. 102, 447 F. 2d 1271 (1971); *Smith* v. *State Executive Committee of Democratic Party of Georgia,* 288 F. Supp. 371 (ND Ga. 1968); *Lynch* v. *Torquato,* 343 F. 2d 370 (CA3 1965). See also the Texas White Primary Cases, *Nixon* v. *Herndon,* 273 U. S. 536 (1927); *Nixon* v. *Condon,* 286 U. S. 73 (1932); *Smith* v. *Allwright,* 321 U. S. 649 (1944); *Terry* v. *Adams,* 345 U. S. 461 (1953). For the differing views of commentators, see Note, Legal Issues of the 1972 Democratic Convention and Beyond, 4 Loyola U. of Chi. L. J. 137 (1973); Note, Regulation of Political Parties: Vote Dilution in the Presidential Nomination Procedure, 54 Iowa L. Rev. 471 (1968); Chambers & Rotunda, Reform of Presidential Nominating Conventions, 56 Va. L. Rev. 179 (1970); Note, Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions, 78 Yale L. J. 1228 (1969); Comment, One Man, One Vote and Selection of Delegates to National Nominating Conventions, 37 U. Chi. L. Rev. 536 (1970); Bellamy, Applicability of the Fourteenth Amendment to the Allocation of Delegates to the Democratic National Convention, 38 Geo. Wash. L. Rev. 892 (1970); Raymar, Judicial Review of Cre-

## I

There is a threshold question to be decided before we discuss the merits of the constitutional issue. During June and July 1972 the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit twice considered an action brought by one of the Wigoda delegates, Thomas E. Keane, against the National Democratic Party. That action challenged the constitutionality of the Party guidelines allegedly violated in the selection of the Wigoda delegates. The Cousins delegates intervened and the Party counter-claimed for an injunction enjoining the Wigoda delegates from proceeding with the state-court action. The case was initially dismissed on appeal because the Credentials Committee had not yet decided the petitioners' challenge, *Keane* v. *National Democratic Party*, No. 1010–72 (DC June 19, 1972); *Keane* v. *National Democratic Party*,

---

dentials Contests: The Experience of the 1972 Democratic National Convention, 42 Geo. Wash. L. Rev. 1 (1973); Note, Judicial Intervention in the Presidential Candidate Selection Process: One Step Backwards, 47 N. Y. U. L. Rev. 1184 (1972).

(2) whether national political parties are subject to the principles of the reapportionment decisions, or other constitutional restraints, in their methods of delegate selection and allocation. Compare *Bode* v. *National Democratic Party*, 146 U. S. App. D. C. 373, 452 F. 2d 1302 (1971), with *Irish* v. *Democratic-Farmer-Labor Party*, 399 F. 2d 119 (CA8 1968); and see *Gray* v. *Sanders*, 372 U. S. 368, 378 n. 10 (1963). For a history of a century of resolutions of credentials disputes through party procedures and machinery see R. Bain & J. Parris, Convention Decisions and Voting Records (2d ed. 1973); Goldstein, One Man, One Vote and the Political Convention, 40 U. Cin. L. Rev. 1 (1971).

(3) whether or to what extent national political parties and their nominating conventions are regulable by, or only by, Congress. See *Newberry* v. *United States*, 256 U. S. 232, 275 (1921) (Pitney, J., dissenting); R. Horn, Groups and the Constitution 17–18 (1956); Note, Freedom of Association and the Selection of Delegates to National Political Conventions, 56 Cornell L. Rev. 148, 152–160 (1970).

No. 72–1562 (DC Cir. June 20, 1972). After the Credentials Committee announced its adoption of the Hearing Officer's Findings and Report, the suit proceeded. The District Court sustained the constitutionality of Guideline C–6, see n. 1, *supra*, and dismissed Keane's suit, while denying the counterclaim. The Court of Appeals, on July 5, affirmed the dismissal but granted the counterclaim directing the entry of an order enjoining the Wigoda delegates from proceeding with the Circuit Court suit. *Brown* v. *O'Brien*, 152 U. S. App. D. C. 157, 469 F. 2d 563. This Court, however, at a Special Term on July 7, stayed the judgment of the Court of Appeals, 409 U. S. 1. On October 10, 1972, we granted Keane's petition for certiorari, vacated the judgment of the Court of Appeals, and remanded for a determination of mootness. 409 U. S. 816. The Court of Appeals, on February 16, 1973, held the case moot insofar as it concerned seating of delegates at the July Convention, found no basis for relief as to any other matter, and entered a judgment affirming the District Court's order of July 3 dismissing Keane's suit, 155 U. S. App. D. C. 18, 475 F. 2d 1287.

Based upon these events, petitioners argue that the Illinois Circuit Court was without jurisdiction to enter its July 8 injunction notwithstanding this Court's July 7 stay of the Court of Appeals' judgment. The argument relies upon the reference in the Court's *per curiam* opinion supporting the stay to "the large public interest in allowing the political processes to function free from judicial supervision," 409 U. S., at 5, which, petitioners argue, "established the right, in the particular circumstances of this case, of the 1972 Democratic National Convention to decide the Chicago credentials contest." Brief for Petitioners 20. The argument is without merit. The *per curiam* did not decide the question before us in this case.

The stay order, in terms, unambiguously suspended the operative effect of the Court of Appeals' judgment without qualification and in its entirety, and nothing in the quoted excerpt from the *per curiam* opinion in any wise qualified that effect.[5] We agree with the Illinois Appellate Court, therefore, that the stay order "completely froze the order of the Court of Appeals, including the injunction order directed to the Circuit Court of Illinois, thereby allowing the Circuit Court to proceed." 14 Ill. App. 3d, at 468, 302 N. E. 2d, at 622–623.

Petitioners argue further that in any event the stay order "did not alter the binding collateral estoppel and res judicata effect of that [Court of Appeals] judgment so as to permit collateral attack in the Illinois state courts." Brief for Petitioners 28. We need not address the merits of that argument. The Illinois Appellate Court rejected it on the ground that the res judicata defense had not been pleaded and proved in the Circuit Court as required by Illinois law established in *Svalina* v. *Saravana*, 341 Ill. 236, 173 N. E. 281 (1930). 14 Ill. App. 3d, at 469, 302 N. E. 2d, at 623.[6] We have no basis for disagreement with the holding of the Appellate Court

---

[5] Our order provided that "[t]he applications for stays of the judgments of the Court of Appeals are granted." 409 U. S., at 5. This order applied also to *Keane's* companion case, *O'Brien* v. *Brown,* 409 U. S. 1 (1972), which concerned challenges to the California delegation to the 1972 Democratic National Convention.

[6] The Illinois Appellate Court also found res judicata unavailable for other reasons, including a difference between the issue before it and the issue in *Keane:*

"The issue which is central to the instant cause is the Illinois Election Code (Ill. Rev. Stat. 1971, ch. 46, § 7–1 *et seq.*), and the right of the plaintiffs who were elected pursuant to its provisions to serve in their elective office. The issue which was central to the litigation which ensued in *Keane* v. *National Democratic Party* was the constitutionality of the guidelines of the National Democratic Party . . . ." 14 Ill. App. 3d 460, 468–469, 302 N. E. 2d 614, 623.

"that the [petitioners] neither formally pleaded nor attempted to prove their claim of *res judicata* based on the decision of the Court of Appeals for the District of Columbia Circuit." *Ibid.*[7] This constitutes an adequate state ground that forecloses any jurisdiction that we might possess to review the merits of the res judicata defense. See, *e. g., Louisville & N. R. Co.* v. *Woodford,* 234 U. S. 46 (1914). Accordingly, we turn to consideration of the merits of the constitutional question.

## II

The National Democratic Party and its adherents enjoy a constitutionally protected right of political association. "There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. . . . The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper* v. *Pontikes,* 414 U. S. 51, 56–57 (1973). "And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States." *Williams* v. *Rhodes,* 393 U. S. 23, 30–31 (1968). Moreover, "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adher-

---

[7] Indeed, petitioners maintain only that the Court of Appeals' decision was "presented" and "argued" before the Circuit Court judge, not that res judicata was formally pleaded. See Brief for Petitioners 16, 45. Moreover, while petitioners argued in the Circuit Court that the Court of Appeals' injunction against the state proceeding was effective despite this Court's stay, they did not couch the argument in terms of the Court of Appeals' decision having res judicata effect. Transcript of July 8, 1972, pp. 25–30, 32 *et seq.*

ents." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957); see *NAACP* v. *Button,* 371 U. S. 415, 431 (1963).

Petitioners rely upon these principles and contend that, since the July 8 Circuit Court injunction was fashioned to effectuate state law by barring them from serving as delegates at their Party's National Convention, the injunction constituted an unconstitutional "significant interference" with protected rights of political association. *Bates* v. *Little Rock,* 361 U. S. 516, 523 (1960); see also *Kusper* v. *Pontikes, supra,* at 58.

The Illinois Appellate Court conceded that petitioners and the Party enjoyed "fundamental constitutional rights of free political association." 14 Ill. App. 3d, at 470, 302 N. E. 2d, at 624. The Appellate Court justified the injunction, however, on the ground that the "interest of the state in protecting the effective right to participate in primaries is superior to whatever other interests the party itself might wish to protect." *Id.,* at 477, 302 N. E. 2d, at 629. In other words, the Appellate Court identified as the State's legitimate interest the protection of votes cast at the primary from the impairment that would result from stripping the respondents of their elected-delegate status.

We observe at the outset that petitioners' compliance with the injunction would not have assured effectuation of the state objective to seat respondents at the Convention. The Convention was under no obligation to seat the respondents but was free, as respondents concede,[8] to leave the Chicago seats vacant and thus defeat the objective.

---

[8] "It is possible that the Convention would have rejected the elected delegates and that Chicago, Illinois would have been without representation at the convention." Brief for Respondents 46. Thus, respondents concede that their protected rights of political association do not entitle them to relief compelling the Party to accept them as delegates.

We proceed, however, to considering whether the asserted state interest justifies the injunction. Even though legitimate, the " 'subordinating interest of the State must be compelling' . . ." to justify the injunction's abridgment of the exercise by petitioners and the National Democratic Party of their constitutionally protected rights of association. *NAACP* v. *Alabama*, 357 U. S. 449, 463 (1958).

Respondents argue that Illinois had a compelling interest in protecting the integrity of its electoral processes and the right of its citizens under the State and Federal Constitutions to effective suffrage. They rely on the numerous statements of this Court that the right to vote is a "fundamental political right, because preservative of all rights." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370 (1886); *Reynolds* v. *Sims*, 377 U. S. 533, 562 (1964); *Williams* v. *Rhodes*, 393 U. S., at 31; *Kramer* v. *Union School District*, 395 U. S. 621, 626 (1969); *Dunn* v. *Blumstein*, 405 U. S. 330, 336 (1972). But respondents overlook the significant fact that the suffrage was exercised at the primary election to elect delegates to a National Party Convention. Consideration of the special function of delegates to such a Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest. Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence. The vital business of the Convention is the nomination of the Party's candidates for the offices of President and Vice President of the United States. To that end, the state political parties are "affiliated with a national party through acceptance of the national call to send state delegates to the national convention." *Ray* v. *Blair*, 343 U. S. 214, 225 (1952). The States themselves have no constitutionally mandated role in the great task of the

selection of Presidential and Vice-Presidential candidates.[9] If the qualifications and eligibility of delegates. to National Political Party Conventions were left to state law "each of the fifty states could establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result." *Wigoda* v. *Cousins*, 342 F. Supp. 82, 86 (ND Ill. 1972). Such a regime could seriously undercut or indeed. destroy the effectiveness of the National Party Convention as a concerted enterprise engaged in the vital process of choosing Presidential and Vice-Presidential candidates—a process which usually involves coalitions cutting across state lines.[10] The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State. The paramount necessity for effective performance of the Convention's task is underscored by Mr. Justice Pitney's admonition "that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. . . . As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made." *Newberry* v. *United States*, 256 U. S. 232, 286 (1921) (dissenting opinion).

---

[9] Early Presidential nominations were made by caucuses of Members of Congress belonging to the National Parties. See W. Goodman, The Two-Party System in the United States 153–158 (3d ed. 1964). There have been recent proposals that parties use regional or national primaries to choose their nominees. See, *e. g.*, New York Times, Apr. 18, 1972, p. 12, col. 5 (five regional primaries proposed by Senator Packwood; national primary proposed by Senators Mansfield and Aiken).

[10] Several delegations selected according to state law have been denied seating in Convention resolution of disputes. See, *e. g.*, R. Bain & J. Parris, Convention Decisions and Voting Records 283–284, 323 (2d ed. 1973) (1952 Republican Convention, Georgia delegation; 1968 Democratic Convention, Mississippi delegation).

Thus, Illinois' interest in protecting the integrity of its electoral process cannot be deemed compelling in the context of the selection of delegates to the National Party Convention. Whatever the case of actions presenting claims that the Party's delegate selection procedures are not exercised within the confines of the Constitution— and no such claims are made here—this is a case where "the convention itself [was] the proper forum for determining intra-party disputes as to which delegates [should] be seated." *O'Brien* v. *Brown,* 409 U. S. 1, 4 (1972).

*Reversed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, concurring in the result.

We agree with the Court that the members of political parties enjoy a constitutionally protected right of freedom of association secured by the First and Fourteenth Amendments to the United States Constitution. The right of members of a political party to gather in a national political convention in order to formulate proposed programs and nominate candidates for political office is at the very heart of the freedom of assembly and association which has been established in earlier cases decided by the Court. *NAACP* v. *Alabama,* 357 U. S. 449 (1958); *Bates* v. *Little Rock,* 361 U. S. 516, 523 (1960); *Healy* v. *James,* 408 U. S. 169 (1972).

We also agree that the interest of the State of Illinois in protecting its electoral processes for primary delegate selection is not sufficient to authorize a flat prohibition against petitioners' efforts to have the 1972 National Democratic Convention seat them as party delegates from Illinois. The operation of the injunction issued by the Illinois Circuit Court in this case was as direct and

severe an infringement of the right of association as can be conceived. Beside it, the sort of "subtle governmental interference" which was referred to in *Bates* v. *Little Rock, supra,* pales. We would by no means downplay the legitimacy of the interest of the State in assuring that delegates to the Party Convention chosen pursuant to its electoral processes, and presumably representing the view of the majority of the party's electors in that State, are seated at the Convention. But since it is conceded that the National Convention, and not the State, had the ultimate authority to choose among contesting delegations, we do not believe the State's interest is sufficient to support a total restriction on the petitioners' right to assemble, associate with fellow members of a political party, and urge upon the Convention their claim to be seated as delegates.

While the Court arrives at substantially the same conclusion, in the process of doing so it seems to us to use unnecessarily broad language, to intimate views on questions on which it disclaims any intimation of views, and to turn virtually on its head the Court's opinion in *O'Brien* v. *Brown,* 409 U. S. 1 (1972).

Footnote 4 of the Court's opinion disclaims any intimation of views on the following questions: "(1) whether the decisions of a national political party in the area of delegate selection constitute state or governmental action . . . . (2) whether national political parties are subject to the principles of the reapportionment decisions, or other constitutional restraints, in their methods of delegate selection and allocation. . . . (3) whether or to what extent national political parties and their nominating conventions are regulable by, or only by, Congress." But immediately following the disclaimer, the Court proceeds to cite numerous opinions of courts of appeals and district courts, as well as law review commentaries, which to the unsophisticated mind might seem to portend an

answer to each of these questions. Conspicuous by its absence in the footnote is any reference to this Court's opinion in *O'Brien* v. *Brown, supra,* decided slightly more than two years ago, where we reviewed two cases from the United States Court of Appeals for the District of Columbia Circuit. That court in those cases had taken the view that action by the National Party did constitute "state action" for purposes of the Fourteenth Amendment, and proceeded to apply its interpretation of that Amendment to action of the Credentials Committee of the Democratic National Convention. We stayed the orders of the Court of Appeals in those cases, saying:

> "It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. Highly important questions are presented concerning justiciability, whether the action of the Credentials Committee is state action and, if so, the reach of the Due Process Clause in this unique context. Vital rights of association guaranteed by the Constitution are also involved. While the Court is unwilling to undertake final resolution of the important constitutional questions presented without full briefing and argument and adequate opportunity for deliberation, *we entertain grave doubts as to the action taken by the Court of Appeals.*" 409 U. S., at 4–5. (Emphasis supplied.)

In the same opinion, we distinguished the cases of *Terry* v. *Adams,* 345 U. S. 461 (1953), and *Smith* v. *Allwright,* 321 U. S. 649 (1944), both cited in n. 4 of the

Court's opinion in the present case, on the ground that they involved invidious discrimination based on race in a primary contest within a single State. 409 U. S., at 4.

We see no reason to recede from any of the language we used in *O'Brien* v. *Brown, supra,* and therefore find the Court's citation of that case to be a virtual repudiation of it. The Court says, *ante,* at 491:

> "Whatever the case of actions presenting claims that the Party's delegate selection procedures are not exercised within the confines of the Constitution— and no such claims are made here—this is a case where '. . . the convention itself [was] the proper forum for determining intra-party disputes as to which delegates [should] be seated.' *O'Brien* v. *Brown,* 409 U. S. 1, 4 (1972)."

In *O'Brien* v. *Brown* we *were* dealing, as we need not deal here, with actions presenting claims that the Party's delegate selection procedures were not exercised within the confines of the Constitution, and it was in that context that the earlier quoted language from that case was used. That issue is not present in this case, nor are the others on which the Court disclaims any views, and for that reason we would think it better judicial procedure not to go beyond what we have already said in *O'Brien* v. *Brown,* and foreshadow results in cases not before us.[1]

---

[1] Gratuitous observations are particularly inappropriate in this area where the Court has long eschewed passing on issues not required for resolution of the case presented. *Gray* v. *Sanders,* 372 U. S. 368, 378 n. 10 (1963). The crucial and sensitive nature of questions relating to the process of Presidential selection was pointed out by James Wilson, a delegate to the Constitutional Convention, in commenting on the manner of Presidential selection set forth in the Constitution:

"This subject has greatly divided the House, and will also divide people out of doors. It is in truth the most difficult of all on which we have had to decide." 2 M. Farrand, Records of the Federal Convention of 1787, p. 501 (Rev. ed. 1937).

The Court states, *ante,* at 490, that the National Convention "serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State." While this may be a perfectly apt statement of a political fact, we believe it is an unnecessarily broad and vague statement to be contained in an opinion of this Court. The political fact—that the interest served by national political conventions transcends the boundaries of any single State—weighs in favor of petitioners on the scale which balances their constitutional claim against the State's interest in the integrity of its electoral process. But the dissenting opinion of Mr. Justice Pitney in *Newberry* v. *United States,* 256 U. S. 232, 285 (1921), without more, does not establish for us that there is a "national interest" which standing alone, apart from valid congressional legislation or constitutional provision, would override state regulation in this situation.

Nor can we agree with the Court's characterization of the role of the States in this process when it says that "[t]he States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates." *Ante,* at 489–490. Under Art. II, § 1, the States are given the power to "appoint, in such Manner as the Legislature thereof may direct" Presidential electors.[2] See *In re Green,* 134 U. S. 377, 379 (1890); *McPherson* v. *Blacker,* 146 U. S. 1, 27–28 (1892); *Ray* v. *Blair,* 343 U. S. 214 (1952); *Oregon* v. *Mitchell,* 400 U. S. 112, 291 (1970) (opinion of STEWART, J., joined by BURGER, C. J., and BLACKMUN, J.).

---

[2] Article II, § 1, provides in part:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . . The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes . . . ."

Under our constitutional system, the States also have residual authority in all areas not taken from them by the Constitution or by validly enacted congressional legislation. The question for us, therefore, is not whether the States have a "constitutionally mandated role" in the task of selecting Presidential and Vice-Presidential candidates, but whether the authority of the State of Illinois is sufficient in this case to authorize an injunction flatly prohibiting petitioners from asserting before the Democratic National Convention their claim to be seated as delegates. We do not believe that it is, and therefore concur in the result reached by the Court. But we would rest the result unequivocally on the freedom to assemble and associate guaranteed by the First and Fourteenth Amendments, and neither discuss nor hint at resolution of issues neither presented here nor previously resolved by our cases.

MR. JUSTICE POWELL, concurring in part and dissenting in part.

I agree that the National Convention of the Democratic Party could not be compelled to seat respondents. I disagree, however, that the Illinois courts are without power to enjoin petitioners from sitting *as delegates representing districts in that State.* To this limited extent, I dissent.

The Illinois Legislature has enacted a comprehensive scheme for regulating the election of delegates to national party conventions, Ill. Rev. Stat., c. 46, § 7-1 *et seq.* (1973), including a means by which a defeated candidate may challenge the election. § 7-63. Respondents were duly elected in primaries held in various election districts in the city of Chicago. Petitioners, for the most part, were people who had lost in these primaries and who eventually were selected in private caucuses as a challenge delegation. They made no challenge under state law but, rather, they successfully unseated respondents at

the Convention and had themselves seated as delegates representing the districts in which the ousted delegates had been elected.

The Illinois Appellate Court concluded that the Democratic Party

"most certainly could not seat people of their choice and force them upon the people of Illinois as their representatives, contrary to their elective mandate." 14 Ill. App. 3d 460, 479, 302 N. E. 2d 614, 631 (1973).

I agree with this statement. Had the court's decision been limited to this conclusion, it would not have infringed in any way the associational rights of petitioners or the Democratic Party. The National Convention of the Party may seat whomever it pleases, including petitioners, as delegates at large. The State of Illinois, on the other hand, has a legitimate interest in protecting its citizens from being *represented* by delegates who have been rejected by these citizens in a democratic election. Accordingly I would affirm the injunctions of the trial court insofar as they barred petitioners from purporting, contrary to Illinois law, to represent certain election districts of that State.*

---

* I also agree with the Court that this case intimates no views regarding other efforts to regulate party conventions. Congressional regulation of national conventions or state regulation of state primaries or conventions. for state offices raises different considerations requiring a wholly different balance.