Albert E. GOLLIN et al.,
Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS et al., Respondents,

The Jimmy Carter Presidential Campaign, Intervenor.

No. 10942.

District of Columbia Court of Appeals,

Argued June 16, 1976.

Decided June 23, 1976.

Harley J. Daniels, Washington, D.C., with whom R. Robert Linowes, Washington, D.C., was on the petition, for petitioners.

Winfred R. Mundle, Gen. Counsel to the Board of Elections and Ethics, Washington, D.C., for respondents.

Bardyl R. Tirana, Washington, D.C., for intervenor.

Before GALLAGHER and NEBEKER, Associate Judges, and PAIR, Associate Judge, Retired.

PER CURIAM:

This case arises from the refusal of the Board of Elections and Ethics (Board) to count 8,617 ballots cast in the District of Columbia Presidential Preference Primary and Delegate Election held on May 4, 1976. The petitioners, alleging that the refusal of the Board has resulted in the disenfranchisement of the voters involved, have asked this court to exercise the power granted to it by D.C.Code 1973, § 1–1111 (b) and order the Board to count the disputed ballots. The respondent Board and the intervenor, Jimmy Carter Presidential Campaign (Carter Campaign), have moved this court to dismiss the petition on jurisdictional grounds. Because of the imminence of the Democratic National Convention, an expedited hearing consolidating argument on both the motions and the petition was granted.

Since we find that this court has jurisdiction to review the actions of the Board in conducting the primary, and inasmuch as the voters whose ballots are in issue have demonstrated an intent to have their votes counted as indicating a preference for a particular candidate or uncommitted delegate slate, we set aside the certified results of the election and order the Board to count the disputed ballots, to retabulate the totals received by the candidates and uncommitted slates, and to inform this court of the new totals so that this court may "declare the true results of the election" pursuant to § 1–1111(b).

I.

In the May 4 primary, Democratic voters were asked to indicate their preference for a Democratic presidential candidate and to vote for the delegates they wished to represent that candidate at the Democratic National Convention. Upon arriving at the polling place, each voter was given a five-ballot packet and an attached sheet of instructions. The instructions stated:

1) You may vote on only *one* (1) of the attached ballots;

2) You may vote for a presidential candidate or an uncommitted slate by filling in the box at the top of the ballot of your choice;

3) You *must* vote for only those delegates listed on that ballot;

4) You may vote for no more than six (6) [or seven (7)[1]] delegates on that ballot. [Emphasis in the original.]

Each of the five ballots listed at its top the name of one of the three presidential candidates, or "Uncommitted #1", or "Uncommitted #2". Next to this heading was a box to be filled in by the voter if he preferred that candidate or uncommitted slate. Below the heading was a list of delegates committed to the presidential candidate or for the uncommitted slate whose name or designation constituted the heading. Each voter was then to choose six or seven delegates (depending on the voting district) by filling in the boxes next to the desired delegates' names. As a result of the design of this ballot and the instruction that only one of the ballots could be marked, voters could only vote for delegates committed to a single candidate or slate. Of the 42,072 ballots cast, the astounding sum of 17,490 ballots were invalidated. Of these 17,490 ballots, 8,873 were invalidated because voters cast votes on more than one ballot or failed to mark any ballot.[2] The ballots that are in issue in the present case are 8,617 ballots on which voters selected delegates committed to a particular candidate or listed on an uncom-

1. The number of delegates for whom a voter could vote depended on the voting district of the voter.

2. The petitioners do not allege that these 8,873 ballots should have been counted by the Board.

mitted slate, but failed to mark the box next to the name of that candidate or uncommitted slate. The Board of Elections and Ethics has refused to count these ballots as indications of presidential preference. On May 18, the Board conducted a hearing to decide whether to count the disputed ballots as an expression of candidate or uncommitted slate choice. The petitioners appeared at the hearing and urged that the ballots be so counted. The Board rejected this suggestion and on May 26 certified the results of the election without crediting those ballots to the candidate or slate heading the ballots. The petitioners filed a petition for review of the Board's action with this court on June 2.

## II.

Petitioners rely upon D.C.Code 1973, § 1–1111(b) to establish their right to review of the election by this court. That section states in part: "(b) Within seven days after the Board certifies the results of an election, any person who votes in the election may petition the District of Columbia Court of Appeals to review such election." Petitioners both allege that they voted in the May 4 primary and this allegation is not denied by either the respondent or by the Carter Campaign.

However, the Board of Elections and Ethics contends in its motion to dismiss that, despite the existence of § 1–1111(b), this court is without jurisdiction to entertain the petition for review. The Board advances two arguments to support this contention. First, it argues that the petitioners failed to exhaust their administrative remedies since the petitioners can either petition the Board for a rehearing or can seek relief from the Credentials Committee of the Democratic National Committee. Second, the Board claims that the Democratic National Committee and not this court is the proper forum for resolution of this dispute.

Urging that petitioners have not exhausted their administrative remedies, the Board relies upon our recent opinion in *Foley v. District of Columbia Board of Elections and Ethics,* D.C.App., 358 A.2d 305 (1976). But that case is distinguishable on its facts. There petitioner challenged the constitutionality of a statute which required certain District of Columbia Government employees ·to file financial statements. Finding that petitioner had not applied for an exemption as permitted by a regulation of the Board, this court held that petitioner had not exhausted his administrative remedies.

In our view, petitioners exhausted whatever administrative remedies they had when they participated in the hearing conducted by the Board and urged that the votes be counted. We find no substance in the argument that petitioners were required to petition the Board for a rehearing, nor do we find substance in the argument that petitioners were required to first seek relief from the Credentials Committee of the Democratic National Party. D.C. Code 1973, § 1–1111(b) provides in language crystal clear for review by this court of the Board's certification of any election. We cannot agree, therefore, that our jurisdiction in this regard has been superseded by any rule of the Democratic Party.

The Board merges its exhaustion of administrative remedies argument with an argument contending that the Democratic National Committee and not this court is the proper forum for resolution of this dispute. The Board first implies that a Democratic Party rule which requires that disputes arising from the seating of delegates be decided by the Party takes precedence over § 1–1111(b) and thus deprives this court of jurisdiction. The Board similarly claims that, as a result of the close collaboration between the Board and the Democratic Party in devising the rules governing the primary, only the Democratic National Committee can decide disputes emanating from the primary election. The Board argues that this primacy of the Party over the government is mandated by

the Supreme Court's opinion in *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L. Ed.2d 595 (1975). In particular, the Board relies upon statements in the opinion that "[t]he States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates" and that " 'the convention itself [is] the proper forum for determining intra-party disputes as to which delegates [should] be seated.'" *Cousins v. Wigoda, supra* at 489–90 & 491, 95 S.Ct. at 549.

■ These statements, read in isolation from the factual background of the *Cousins* case, might arguably lend support to the broad interpretation of *Cousins* espoused by the Board. When the factual background is taken into consideration, however, the distinction between *Cousins* and the instant case becomes apparent. In *Cousins,* the Court was dealing with an attempt by a state court to enjoin a slate of delegates from acting as delegates to the Democratic National Convention. The state court attempted to interfere in the determination of the qualifications of delegates to the convention. If the injunction had been obeyed, the result would have been to substitute the state court's judgment for that of the Democratic Party on the question of whether a delegation should be seated. This attempt by the state court would have violated the petitioners' constitutionally protected right of political association.

■ In the present case, no such right is at stake. Any review by this court would not attempt to direct the Democratic Party how to interpret its rules on delegate selection or to compel the Party to accept any delegates. Rather, the purpose of this court in reviewing the election would merely be to insure that no voter was disenfranchised through improper interpretation on the part of the Board in an election being conducted under the provisions of the D.C.Code; and that the results certified by the Board are in fact the true results.

In common with the numerous occasions on which this court reviews the actions of an agency, the function of the court in the present case is to determine whether the Board performed its duty in a constitutionally and statutorily correct manner. In reviewing the action of the Board, this court would not be interfering with the internal affairs of the Democratic Party since action by the Credentials Committee or any other committee of the Democratic Party would not be precluded.

Recently, the Supreme Judicial Court of Massachusetts, in interpreting *Cousins v. Wigoda* and assessing its impact upon the state's decision to forbid the placing of delegates' names on primary ballots, concluded:

> Although the Legislature may not select delegates to a national political convention, it has the right to prescribe procedures to be followed in the selection of delegates [citation omitted] provided that it does not intrude unconstitutionally on the rights of association of the political parties. [*Sears v. Secretary of the Commonwealth,* Mass., 341 N.E.2d 264, 270 (1975).]

We agree with this interpretation and hold that Congress, in passing § 1–1111(b), was doing no more than prescribing the procedure by which primary election results could be judicially reviewed.

■ Like the Board, the Carter Campaign also relies upon an exhaustion of administrative remedies argument. The Carter Campaign's argument differs in that it cites a particular administrative remedy, 22 DCRR § 1.131 *et seq.,* which sets forth the procedure by which parties may get a hearing before the Board. That remedy, however, is only available to individuals or groups who may institute action before the Board by challenge according to law or regulations. The only law or regulation permitting such challenges pertains to challenges to nominating petitions and challenges to persons who have been allowed

to vote by a challenged ballot. *See* D.C. Code 1973, § 1–1108(p)(1); D.C.Code 1975 Supp., § 1–1109(e). Neither of these two situations is involved here.

█ The Carter Campaign further argues that the petition is untimely since the petitioners did not challenge the form of the ballot before the election. This argument misses the point. The issue before us is not the form of the ballot but whether the ballots in dispute evidence an intent sufficient to warrant crediting those ballots to particular presidential candidates or uncommitted slates.

### III.

█ Section 1–1111(b) imposes upon this court the duty to determine whether the results certified by the Board of Elections and Ethics are, in fact, the true results. In determining the true results this court must attempt to discern the intent of the voters. A New Jersey court has enunciated the means by which to discern this intent:

> In a word, reliable evidence . . . should be searched to effectuate the voter's wish and preserve the franchise. [*Petition of Fifteen Registered Voters of County of Sussex*, 129 N.J.Super. 296, 301, 323 A.2d 521, 523, *petition for certification denied*, 65 N.J. 577, 325 A.2d 711 (1974).]

Furthermore, the standard to be applied in determining intent is not one of absolute sureness. Reasonable certainty is enough. *Petition of Fifteen Registered Voters of County of Sussex, supra* at 302, 323 A.2d at 524. *See also Gulino v. Cerny*, 13 Ill.2d 244, 148 N.E.2d 724 (1958). In attempting to discern intent, moreover, this court is mindful that a prime purpose of Congress in formulating the District of Columbia Elections law was to keep the franchise open to as many people as possible. *See Kamins v. Board of Elections for District of Columbia*, D.C.App., 324 A.2d 187 (1974); *Curtis v. Bindeman*, D.C.App., 261 A.2d 515 (1970).

█ After an examination of the structure of the ballots and the means by which those ballots were to be counted, we conclude that the voters whose ballots are in question intended to not only vote for the delegates whose names they checked but also to vote for the candidate or uncommitted slate whose name or designation headed that ballot.

A number of considerations compel this conclusion. Firstly, we observe that it was impossible to vote for a presidential candidate or uncommitted slate and then vote for delegates pledged to another candidate or uncommitted slate. Each ballot listed the name of only one candidate or uncommitted slate and the names of the delegates committed to that candidate or for that slate. If a voter attempted to vote for a candidate from one ballot and a delegate from another ballot, the voter's entire packet of ballots was invalidated. Secondly, the rules adopted by the Party and approved by the Board required all delegates pledged to a candidate to file with the Party an affidavit indicating that the candidate consented to have those delegates run on his slate. *See* Delegate Selection Process Rules and Procedures. Thirdly, as conceded by both the Board and the Carter Campaign, the delegates pledged to a particular candidate must vote for that candidate for two ballots at the convention. Fourthly, a delegate could not win an election, regardless of the number of people who voted for him, unless the candidate or uncommitted slate on whose ballot the delegate ran received enough votes to be able to send at least one delegate to the convention. The candidate would need a minimum of 15% of the total vote to be allowed to send any delegates to the convention. The number of delegates a candidate can send depends upon the candidate's proportion of the total vote. The conclusion which we derive from these four considerations is that each candidate or un-

committed slate is inextricably linked to the delegates whose names were listed under that candidate's name or that uncommitted slate's numerical designation.

The Carter Campaign and the Board both hypothesize a situation in which voters intentionally refused to express a preference for President but voted for individual delegates because they did not favor the candidate but did favor one or more of the individual delegates committed to that candidate. This hypothesis ignores the reality of the structure of the primary and imputes an intent on the part of the voters to cast meaningless ballots. The composition of the ballots was such that individual delegates could not be chosen if the names of the desired candidates appeared on different ballots. Voters who marked more than one ballot had their votes voided. A vote for individual delegates without a corresponding vote for the candidate to whom those delegates are committed would be meaningless. Those delegates could not be sent to the convention unless the candidate to whom they were committed received a sufficient number of votes to send the delegates to the convention. If the desired delegates were sent to the convention, they would be required to vote for the candidate the voter presumably disfavored for two ballots.

Fatal to the probability of the hypothetical selection advanced by the Board and the Carter Campaign is its total inapplicability to uncommitted slates. In the case of the two uncommitted slates, the voters could choose individual delegates. But, unlike the situation with slates committed to a particular candidate, delegates listed under the two uncommitted slate designations are not committed to a candidate. As a result, there is no candidate for the voter to disfavor and thus there is no reason to vote only for the delegates and not mark the box next to the slate designation at the top of the ballot. The marking of the box at the top of the uncommitted ballots was essentially a redundant act. This flaw in the applicability of the hypothetical selection advanced by the Board and the Carter Campaign is especially noteworthy since more than 7,200 of the 8,600 ballots in issue here were ballots cast for uncommitted delegates.

Despite the Board's and the Carter Campaign's protestations to the contrary, it appears that the only reasonable intent which can be attributed to those voters whose ballots are the subject of this dispute is that when those voters chose from the stack of five ballots one ballot upon which the name of a single presidential candidate or uncommitted slate appeared, they intended to express a preference, not only for the delegates whose boxes they marked, but also for the candidate or slate whose name or designation headed the ballot.

Consequently, we hold that those ballots must be counted as if they were marked at the top for the presidential candidate or uncommitted slate.

We therefore set aside the certified results of the election and order the Board to count the ballots disputed here, to retabulate the totals received by the candidates and uncommitted slates and to promptly inform this court of the new totals.

*So Ordered.*