**REFORM PARTY OF THE UNITED STATES of America, et. al., Plaintiffs,**

v.

**John J. GARGAN, et. al., Defendants.**

**Reform Party of the United States Of America, et. al., Plaintiffs,**

v.

**Russell J. Verney, et. al., Defendants.**

**Nos. 6:00CV00014, 6:00CV50012.**

United States District Court,
W.D. Virginia,
Lynchburg Division.

March 27, 2000.

Dale A. Cooter, Cooter, Mangold, Tompert & Wayson, P.L.L.C., Washington, DC, for Reform Party of the U.S., Russell J. Verney.

Tracey A. Lenox, Lenox, Biddinger & Conrad, PC, Woodbridge, VA, for John J. Gargan, Reform Party of the U.S.

Stephen E. Hershkowitz, Richard B. Bader, Robert W. Bonham, III, Federal Election Commission, Washington, DC, for Federal Election Com'n, amicus.

## OPINION

MOON, District Judge.

John J. Gargan and Pat Choate each claim to be the Chair of the Reform Party of the United States of America (hereinafter "Reform Party" or "Party"). Gargan and his ally Ronn Young were elected National Party Chair and Treasurer, respectively, at a National Convention in Dearborn, Michigan in July, 1999 (hereinafter "Dearborn Convention"). Choate claims to be the National Party Chair by virtue of a vote of more than two-thirds of the Party's National Committee on February 12, 2000 in Nashville, Tennessee (hereinafter "Nashville Meeting"), which recalled Gargan and Young and elected Choate and Tom McLaughlin as Interim Party Chair and Treasurer, respectively. Young filed suit in the United States District Court for the Western District of Virginia, Harrisonburg Division, seeking among other things for the Court to order Russell Verney, Gerald Moan, and various other individuals aligned with Choate (hereinafter "Choate group") to cease interfering with the administration of Gargan and Young (hereinafter "Gargan group") in their operation of the Reform Party. The Choate group filed suit against the Gargan group in the United States District Court for the Western District of Virginia, Lynchburg Division, seek-

ing among other things for the Court to enjoin the Gargan group from interfering with the Choate group's operations of the Reform Party.

On February 24, 2000, this Court, in the Lynchburg case, ordered the Gargan group to pay into the registry of the Court approximately $2.5 million in federal money it had received from the Federal Election Commission (hereinafter "FEC" or "Commission") to be held preliminarily until a decision as to the rightful leadership of the Party could be determined at a trial to begin on March 22, 2000. On March 13, 2000, the Harrisonburg and Lynchburg cases were consolidated for trial. On March 16, 2000, this Court bifurcated the case for trial purposes, ordering that only the issue of the rightful leadership of the Reform Party would be heard beginning on March 22 and postponing until a later date a trial (if necessary) on subsequent damages.

The essential question before this Court is whether the February 12, 2000 Nashville Meeting, purporting to be a meeting of the National Committee of the Reform Party at which Gargan and Young were recalled as officers, was a duly constituted meeting of the National Committee with the power to take such actions? The Gargan group maintains that the meeting was not a duly constituted meeting with authority to remove him as National Party Chair for the following reasons:

1. The Nashville Meeting was called at an invalid meeting of the Executive Committee,

2. The National Committee membership was not given proper notice of the meeting,

3. Gargan, the Chair who was present at the Nashville Meeting, refused to call the meeting to order, and

4. There were not enough properly credentialed National Committee members to remove Gargan and Young by a two-thirds vote of all registered members.

The Court concludes that the February 12, 2000 Nashville Meeting was called at the request of one-fourth of members of the National Committee, that reasonable notice was given of this meeting, that the meeting was properly called to order and presided over by the Party's Vice Chair, and that more than two-thirds of the registered members of the National Committee voted to recall Gargan and Young and to elect Choate and McLaughlin to succeed them as National Party Chair and Treasurer, respectively. Therefore, the February 12, 2000 Nashville Meeting was a duly constituted meeting of the Reform Party National Committee with authority to remove its officers and elect new ones.

## JURISDICTION

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1331, in that this matter arises under the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, *et seq.* Venue properly rests in this Court pursuant to 28 U.S.C. § 1391(a)(2) and (3).

## FINDINGS OF FACT

1. The Reform Party of the United States of America is a national political party organization registered with the Federal Election Commission. The Reform Party is a minor party, which is defined as a political party "whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 5 percent or more, but less than 25 percent of the total number of popular votes received by all candidates for such office." 26 U.S.C. § 9002(7); 11 C.F.R. § 9008.2(d).

2. As a minor party, the Reform Party is entitled to federal funding of its quadrennial presidential nominating convention under the Presidential Election Campaign Fund Act. *See* 26 U.S.C. § 9008. Under funding formulas set forth by statute and FEC regulations, the Reform Party was entitled to $2,468,921 in convention funds. *See* 26 U.S.C. § 9008(b)(2); 11 C.F.R. § 9008.4(b).

3. To qualify for entitlement and to receive benefits, minor political parties must establish a Convention Committee, which in turn must register with the FEC as a political committee pursuant to 11 C.F.R. part 102. *See* 26 U.S.C. § 9008(b)(3); 11 C.F.R. § 9008.3(a). The Party's National Committee must file an application statement containing certain information prescribed by the Commission at 11 C.F.R. § 9008.3(a)(3). By letter, the Convention Committee must agree to certain conditions set forth at 11 C.F.R. § 9008.3(a)(4). That section further provides that the agreement is also binding upon the National Committee.

4. The Reform Party is governed by a constitution that was adopted on November 2, 1997. The constitution specifically states that "[t]he rules contained in the current edition of Robert's Rules of Order, Newly Revised, shall govern this convention in all cases to which they are applicable and are not inconsistent with any Rules, Bylaws, Constitution or resolutions adopted by the National Convention or National Committee." Art. XII. The Reform Party has not passed any bylaws.

5. The Reform Party constitution provides for a National Convention, which shall be "the supreme governing body of the Reform Party at the national level." Art. III, § 9(a). Under the National Convention is a National Committee, which shall be "responsible for the conducting of the business and affairs of the Reform Party between sessions of the National Convention." Art. IV, § 1. Under the National Committee is an Executive Committee, which shall be "responsible for the conducting of the day to day business and affairs of the Reform Party, between meetings of the National Committee." Art. V, § 1.

6. The Reform Party constitution also provides for the National Party Officers of Chair, Vice Chair, Secretary, and Treasurer. Art. VIII, § 1. Among other duties, the National Party Chair presides over meetings of the Executive Committee, National Committee, and National Conven-

tions. Art. VIII, § 2(a). The Party's constitution provides that the Vice Chair shall serve as the National Party Chair in the Chair's absence. Art. VIII, § 2(b). The Party's Secretary performs many functions, including recording the proceedings of all meetings and providing official notice of all meetings of the Executive and National Committees and the National Convention. Art. VIII, § 2(c). Any National Officer may be removed by a two-thirds roll call vote of the registered members of the National Committee. Art. VIII, § 6(a). The four National Party Officers, along with seven regional representatives, comprise the Executive Committee. Art. V, § 2.

7. A Reform Party National Convention was held on July 23–25, 1999, in Dearborn, Michigan. The Dearborn Convention elected John J. Gargan to succeed Russell Verney as National Party Chair and Ronn Young to succeed Michael Morris as National Treasurer, both effective January 1, 2000. In addition, the Dearborn Convention elected Gerry Moan and Jim Mangia to serve as National Party Vice Chair and Secretary, respectively.

8. A National Committee Meeting was held immediately before the Dearborn Convention on July 23, 1999. At the National Committee Meeting, Sue Harris DeBauche (wife of Ronn Young) made a motion "that in the future a national committee agenda for the meeting be published 30 days prior to the meeting." The motion passed.

9. An Executive Committee meeting was convened on September 1, 1999, during which the committee elected to hold the Party's 2000 Nominating Convention in Long Beach, California rather than St. Paul, Minnesota. The convention site was chosen by a two-thirds majority vote of the eleven-member Executive Committee. However, the Long Beach site only received a passing two-thirds majority after two previous and unsuccessful votes. Also at that meeting, Young was unanimously appointed Chair and Treasurer (hereinaf-

ter "Chair/Treasurer") of the Party's 2000 Convention Committee, a special committee of the Reform Party formed to carry out the business of effectuating plans for the Reform Party's 2000 Presidential Nomination Convention (hereinafter "2000 Nominating Convention"). Under the Reform Party constitution, the chair of a special committee (such as the Convention Committee) shall be appointed by the National Party Chair. Art. VII, § 1(a).

10. By letter dated September 10, 1999, the Reform Party submitted an application statement to the FEC seeking federal funding for the Party's 2000 Nominating Convention. Verney, as the (lame-duck) National Party Chair, and Young, as Chair/Treasurer of the Convention Committee, also submitted a letter of agreements pursuant to 11 C.F.R. § 9008.3. On November 23, the FEC certified $2,468,921 to the Secretary of the Treasury to be paid to the Reform Party 2000 Convention Committee pursuant to 26 U.S.C. § 9008(g) and 11 C.F.R. § 9008.6(d). The Party's Convention Committee received the funds on or about December 8 and deposited the money with First Citizens Bank in Martinsville, Virginia.

11. A National Committee meeting (conducted by mail ballot) was convened on November 29, 1999, at which the committee's members voted to hold the Party's 2000 Nominating Convention in St. Paul. However, the parties are in dispute as to whether a quorum existed at that meeting, and there is insufficient evidence in the record for this Court to make such a determination.

12. An Executive Committee meeting was held on December 16, 1999, at which concern was raised about the amount of time it was taking Young to sign a contract with the Long Beach Convention Center. The Executive Committee passed a motion that directed Young to sign a contract with Long Beach by December 23.

13. On December 28, 1999, the Executive Committee determined that Young had not complied with their directive. While Young had signed a contract with the Long Beach Convention Center, he attached a letter which certain members of the committee believed undermined their dealings with Long Beach. In addition, Young sent to Long Beach a $2,000 deposit when the Committee had agreed that $12,000 was required. However, there was an addendum to the contract Young signed that held the Long Beach site open until January 10, 2000, so long as $2,000 was deposited.

14. The Executive Committee voted to remove Young as Chair/Treasurer of the Convention Committee on December 28 and replaced him with Gerry Moan. In a letter dated December 30, 1999, Moan wrote to First Citizens Bank to inform them that he was the new Reform Party Convention Committee Chair/Treasurer. On the same date, Moan notified the FEC of the change in leadership of the Convention Committee.

15. On January 1, 2000, Gargan, Moan, Mangia, and Young assumed their positions as National Party Chair, Vice Chair, Secretary, and Treasurer, respectively. Immediately upon assuming the position of Chair, Gargan replaced Moan with Young as Convention Committee Chair/Treasurer. The Party's constitution provides that the Chair of a special committee (such as the Convention Committee) "shall be appointed by the National Party Chair." Art. VII, § 1(a). Moan received notice of Gargan's actions sometime during the first week of January, 2000. Despite his being removed as Chair/Treasurer of the Convention Committee and his acknowledged notice of his removal, Moan wrote a letter to the Long Beach Convention Center on January 11 notifying them that it was the intention of the majority of the members of the Party that the 2000 Nominating Convention be held in Long Beach.

16. An Executive Committee Meeting was held on January 9, 2000, at which the issue of the location of the Party's 2000 Nominating Convention arose. A heated debate ensued between certain members of the Executive Committee and Gargan

concerning the convention's proposed location. Gargan initially declared the November 29, 1999 vote of the National Committee to be valid and stated that he would direct Young to cancel the Party's contract with Long Beach. After much rancor, the Executive Committee voted on and unanimously approved an independent site selection committee as a compromise between Gargan and other members of the committee.

17. No later than January 13, 2000, National Secretary Mangia sent the following e-mail to all National Committee members:

> I have received correspondence from more than 25% of National Committee members calling for an "in-person" meeting of the National Committee. According to the Reform Party Constitution this action requires that a meeting of the National Committee be set, to be held in person. I believe it is the responsibility of the Executive Committee to specify a time and place for the meeting.

A National Committee meeting may be called by the National Party Chair or by action of one-fourth of all National Committee members. Art. IV, § 6. Mangia had notice from more than one-fourth of National Committee members on or before January 13 requesting that a National Committee meeting be held.

18. In the meantime, a contract was signed with a convention center in St. Paul to host the Party's 2000 Nominating Convention. As a result, another Executive Committee meeting was held on January 18, 2000. After Moan called the meeting to order, Gargan stated that he believed the meeting was not legally constituted and left the call.[1] Young and DeBauche (a regional representative on the Executive Committee) also left the call. After the remaining committee members voted to proceed, Moan proposed to hold the National Committee meeting on February 12, 2000 in Nashville, Tennessee. The re-

maining Executive Committee members approved the motion by a vote of 6–1.

19. On January 19, 2000, Mangia mailed a call to National Committee members informing them that the Executive Committee had set the date and time of the Nashville National Committee meeting. The notice also included a proposed agenda for the Nashville Meeting, including the recall of Gargan, Moan, and Young.

20. Another Executive Committee meeting was held on February 2, 2000, at which a tentative agenda was unanimously approved for the Nashville Meeting. Gargan and Young were present at the meeting. In the meantime, Gargan issued a call for an emergency National Convention to be held in Las Vegas, Nevada from March 17–19, 2000 (hereinafter "Las Vegas Convention"). Gargan also sent two e-mails to National Committee members urging them not to attend the Nashville Meeting in order to deny it a quorum.

21. The day before the Nashville Meeting, Mangia formed an advisory committee of four people aligned with Gargan and four people aligned with Pat Choate to meet with him that night and review any challenges over the seating of National Committee members. Initially, eleven states were challenged. The challenged states were Alaska, Hawaii, Louisiana, Maryland, New Jersey, North Dakota, South Dakota, Tennessee, Virginia, West Virginia, and Wyoming. In each case, the committee evaluated the evidence and voted on recommendations for each challenge.

22. In the cases of Virginia and Ohio, two separate and competing groups of representatives wished to be seated; in Virginia, neither group was seated whereas in Ohio both groups resolved their conflict internally. In the case of Alaska, Mangia received a letter from a group of Reform Party members who could not attend due to the recent Alaska Airlines crash. Another competing group of Party members

---

1. The January 18 Executive Committee meeting, like all of the other Executive Committee meetings referenced in this Opinion, was held via teleconference.

from Alaska arrived instead. Mangia summarized the contents of the letter for the members in attendance at the Nashville Meeting, which ultimately voted to seat the Alaska representatives who had actually arrived. In the other eight states, the only challenge came from DeBauche within the advisory committee the night before the Nashville Meeting; there was neither a contest over which representatives from a given state were to be seated nor a challenge to their being seated at the Nashville Meeting itself. Representatives from the remaining eight states were all ultimately seated by the members in attendance at the meeting. All the representatives from the challenged states voted to recall both Gargan and Young.

23. The events that transpired immediately prior to the Nashville Meeting being convened can euphemistically be described as "boisterous." Gargan did not open the meeting but instead read a statement. When members in attendance requested that Gargan call the meeting to order, he stated that it was not a legal meeting and that he was not going to call it to order. Nevertheless, Gargan remained in the room at all times, though not always at the microphone. As Vice Chair, Moan then assumed the role of Acting Chair of the meeting and called the body to order. Subsequently, the National Committee passed a motion appointing Tom McLaughlin (who was considered to be more neutral than Moan) to be Acting Chair for the Nashville Meeting only. Votes were then held to remove Gargan, Moan, and Young.

24. The question arose about the meaning of the phrase "two-thirds roll call vote of the registered Members of the National Committee" as it relates to the removal of National Officers. Specifically, the question concerned whether the proper baseline was the 162 members at large (of whom two-thirds would be 108) or the 141 members actually in attendance at the Nashville Meeting (of whom two-thirds would be 94). The parliamentarian ad-

vised the Chair that the Party's constitution was ambiguous. The Chair ruled that the phrase meant at least 108 of the 162 at-large members. The Chair's ruling was objected to from the floor and upon advice of the parliamentarian the issue was submitted to the membership, which overruled the Chair by voting that the phrase meant two-thirds of the members registered at the meeting. The parliamentarian testified that this vote was in accord with the Party's constitution and Robert's Rules of Order.

25. The tally to remove both Gargan and Young was 109 votes in the affirmative, which is more than two-thirds of all members at large.[2] In addition, a separate vote was held in which Young was removed as Convention Committee Chair/Treasurer. Subsequently, Choate was elected to the position of Interim Chair and McLaughlin was elected to the position of Interim Treasurer. In addition, the National Committee reaffirmed Moan's December 28, 1999 appointment as Convention Committee Chair/Treasurer. Finally, the National Committee voted overwhelmingly not to hold the convention called by Gargan in Las Vegas and to ratify the Executive Committee's decision to hold the Party's 2000 Nominating Convention in Long Beach.

26. Gargan convened the Las Vegas Convention anyway, at which individuals were elected to the (theoretically vacant) positions of National Party Vice Chair and Secretary. The members of the Las Vegas Convention also elected to hold the Party's 2000 Nominating Convention in St. Paul. Finally, Gargan declared that twenty-five states had been constitutionally decertified for their failure to send the proper number of delegates to the Las Vegas Convention.

## CONCLUSIONS OF LAW

27. Generally, courts do not concern themselves with whether parliamen-

2. The vote to remove Moan was unsuccessful.

tary rules are followed; instead, courts are concerned with whether the law of the land is followed. *See* 59 Am.Jur.2d *Parliamentary Law* § 4 (1987). Here, a parliamentarian who was employed to advise the Nashville Meeting and who was duly qualified as an expert testified without objection that the meeting was conducted according to the Party's constitution and Robert's Rules of Order. Keeping in mind the admonition above, we discuss the issues raised by the Gargan group.

*The Nashville Meeting Was Called at an Invalid Meeting of the Executive Committee*

■ 28. The objection that the Nashville National Committee meeting was called by an invalid January 18, 2000 Executive Committee meeting is answered by the fact that the Nashville Meeting was called pursuant to the request of one-fourth of the members of the National Committee. Authority for this appears in the Party constitution, article IV, section 6. In his e-mail of January 13, 2000, National Secretary Mangia reported that he had the request for a meeting from one-fourth of the committee members and named the members. Therefore, the Nashville Meeting was not illegally called by the Executive Committee, since it was called prior to the January 18 Executive Committee meeting. Thus, this Court does not need to decide the validity of the January 18 Executive Committee meeting.

*The National Committee Membership Was Not Given Proper Notice of the Meeting*

■ 29. The Party constitution does not explicitly require that notice be provided in advance of a National Committee meeting. However, Robert's Rules of Order (and common sense) require, in the absence of a constitutional provision, that reasonable notice be given. Here, the Party membership was notified by e-mail on January 11, 2000—thirty days before the Nashville Meeting—that one-fourth of the National Committee members had requested a meeting. This was followed by the January 19th call, which included a proposed agenda listing the proposed recall of Gargan and Young. One hundred forty-one of the one hundred sixty-two National Committee members arrived at the meeting. Undoubtedly, there would have been more but for the fact that Gargan contacted the membership and urged them not to attend.

30. The National Committee had passed a resolution at its July Dearborn meeting stating that an agenda be published at least thirty days prior to a National Committee meeting. Thus, the question is whether failure to follow the resolution would invalidate an otherwise valid and constitutional meeting? There is no direct authority in either Robert's Rules of Order or the case law that specifically deals with this situation. Therefore, this Court must reach a conclusion from interpreting the language of the resolution and the Party's constitution.

31. The thirty-day agenda resolution did not require that there be thirty-days notice of a National Committee meeting, but merely that an agenda be published thirty days in advance of the meeting. Inferentially, if an agenda was published thirty days before the meeting there would also be a presumed notice of the meeting. Thus, the Gargan group maintains the rule is that thirty-days notice with an agenda must be sent before any National Committee meeting.

32. However, the plain language of the resolution did not provide that no meeting take place except on thirty-days notice and did not provide that no item of business be considered unless it was on an agenda sent thirty days before the meeting. If the committee meant that no meeting could be held or business be conducted except upon thirty-days notice, it could have said so directly. Moreover, since the resolution only referred to an agenda being published thirty days prior to *the* meeting, it is contemplated that the agenda requirement would apply to a meeting that was already scheduled for at least thirty days. Thus, the language of the resolution leads this

Court to conclude that it was not meant to be a binding notice requirement.

33. Logic also dictates that the resolution was not meant to require that notice be a binding prerequisite to holding a National Committee meeting. The Party's constitution does not specifically provide for an emergency meeting of the National Committee, although it does provide for an emergency meeting of the National Convention to be called by declaration from the Party Chair or by a majority vote of either the Executive or National Committees. *See* art. III, § 10(c)(1). Since a majority vote of the National Committee is one of three methods by which an emergency National Convention may be called, the constitution contemplates that emergency issues may initially be taken up by the National Committee. However, if thirty-days notice is required prior to the calling of a National Committee meeting, then the National Committee would functionally be precluded from calling a National Convention on an emergency basis. This result would be inconsistent with the structure of the constitution.

34. The functions of the National Committee also make a thirty-day notice requirement constitutionally impossible absent a constitutional amendment. The National Committee had among other duties the following:

...b) the temporary filling of National Officer vacancies,...d) formulating and promoting statements of public policy, which are consistent with the Reform Party Statement of Principles,...e) providing for the raising, budgeting, disbursing and accounting of the monies for the operation of the Reform Party in amounts sufficient to fulfill the Party Object, including setting the dollar amount and payment frequency of any dues, fees and assessments to be paid by the National Party by State Party Organizations,... f) providing for ongoing Reform Party public relations and voter education,...g) providing for the keeping, filing and archival storage of the official books, records and lists of the Reform Party.

Art. IV, § 1. To take one example, it is inconceivable that in the event of the death or resignation of the National Party Chair, the National Committee could not fill his vacancy without having to wait thirty days. In sum, the language of the resolution itself, the interrelationship between the National Committee and National Convention under the constitution, and the functions of the National Committee all dictate that the resolution passed at Dearborn was at best aspirational. Anything greater (in this context) would require that a constitutional amendment be passed by a two-thirds vote of the National Convention. *See* art. XIII.

35. In addition, the leadership of the Party changed on January 1, 2000 and by that time there were different members of the National Committee than those who had met at Dearborn prior to the Dearborn National Convention. To allow the National Committee in Dearborn to control what would take place at National Committee meetings after January 1, 2000 would in effect violate Robert's Rules of Order and the spirit of the Party's constitution. Normally one body cannot bind the next. *See* Robert's Rules of Order, Ch. IV, § 8.

36. Accordingly, this Court concludes that the Nashville National Committee meeting did not violate the Party's constitution. Moreover, this Court notes that notice was reasonable and an agenda was sent out at least two weeks before the meeting. Thus, the Nashville Meeting was not invalid for failure of the National Committee members to be given an agenda thirty days prior to the meeting.

*Gargan, the Chair who was Present at the Nashville Meeting, Refused to Call the Meeting to Order*

 37. While this Court finds that the Nashville Meeting was properly called and a quorum of members attended, a question exists as to whether Gargan (as National Party Chair) was acting within his authority to refuse to call the meeting to Order. This Court finds that he was not.

38. The Reform Party constitution requires the National Party Chair to preside over meetings of the National Committee. Art. VIII, § 2(a) (the chair "shall" preside). Presiding officers cannot arbitrarily defeat the will of a body by refusing to entertain motions or permit expression of the majority's will. 59 Am.Jur.2d *Parliamentary Law* § 6 (1987). The will of a majority of members of a meeting body supercedes the will of the presiding officer. *Id.* More to the point, Robert's Rules of Order provides that "[i]f the [Chair] for any reason vacates the chair or is absent, the [Vice Chair] ... normally should take the chair." Ch. XV, § 46.

39. The evidence is undisputed that a majority of the members of the Nashville Meeting desired to have the meeting be called to order; Gargan's refusal to do so was an improper attempt to subvert the will of the controlling body. As such, this Court finds that Gargan was acting improperly and functionally absented himself from the meeting, despite his continuing physical presence in the room. Since the National Party Chair was functionally absent from the room, Vice Chair Moan properly served pursuant to the Party's constitution as "National Party Chair in the absence of the National Party Chair" and appropriately called the meeting to order. *See* Art. VIII, § 2(b). For this Court to find otherwise would result in the perverse outcome that the Chair could thwart the will of the National Committee, despite the constitution's admonishment that "[e]ach National Officer shall be subject to the proper directives and actions of ... the National Committee." Art. VIII, § 9.

*There Were Not Enough Properly Credentialed National Committee Members to Remove Gargan and Young By a Two–Thirds Vote of All Registered Members.*

■■ 40. Courts are traditionally reluctant to interfere with the internal oper-

ations of political parties. *Irish v. Democratic–Farmer–Labor Party of Minnesota,* 399 F.2d 119, 120 (8th Cir.1968), *citing Lynch v. Torquato,* 343 F.2d 370 (3d Cir. 1965). Specifically, with regard to the credentialing of delegates the national party determines whether a state's delegates are seated at a national party convention. *See Democratic Party of United States v. Wisconsin,* 450 U.S. 107, 126, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); *see also Cousins v. Wigoda,* 419 U.S. 477, 489, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (holding that the First Amendment protected the party's right to determine the composition of state delegations). Ultimately, "the proper forum for determining intra-party disputes as to which delegates shall be seated" is the convention itself. *O'Brien v. Brown,* 409 U.S. 1, 4, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), *vacated as moot,* 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 72, 73; *see also Irish,* 399 F.2d at 120 ("the attitude [of the courts] has been one of reluctance and of willingness to have the challenged body initially given the opportunity to attempt to reorganize itself").

41. In light of the well-settled proposition that political parties determine their own credentialing procedures, this Court is limited to analyzing the question of whether the Reform Party registered and/or credentialed[3] members at the Nashville Meeting pursuant to its own rules and constitution. This Court may not look behind the decisions of the individual state parties to certify members to attend the National Committee meeting at Nashville. So long as the Nashville Meeting credentialed and/or registered members—whoever they may be—pursuant to the Party's rules and constitution, this Court may not upset their decision to associate politically.

42. There is no standing committee on the registering and/or credentialing of National Committee members. However, by creating an advisory committee comprised

---

**3.** Throughout the trial, the terms "registering" and "credentialing" were used interchangibly.

of four people from each competing group to review the registration of members for the Nashville Meeting, National Secretary Mangia created what this Court perceives to be a fair and equitable procedure to register and/or credential members for the meeting. More significantly, this Court finds that—to the extent there were procedures for registering and/or credentialing members from contested states—those procedures were followed by the advisory committee and the members in attendance at the Nashville Meeting.

43. To the extent Gargan challenges the registering and/or credentialing of representatives from specific states, those challenges are without merit. While there was a conflict between competing representatives of the Virginia delegation, neither group was seated at the meeting. Thus, there was no prejudice to Gargan or Young. Similarly, to the extent there was a conflict between competing representatives of the Ohio delegation, those competing factions resolved their seating arrangement among themselves.

44. As for the other nine states where only one (albeit disputed) delegation was sent, the right to challenge that delegation was waived by the failure of an opposing delegation to appear. Since no contesting representatives from those states traveled to Nashville, the body was not obligated to hear challenges to the representatives who did actually arrive. Moreover, no challenges were made to the seating of the disputed representatives from the nine contested states by *any* National Committee members at the meeting itself. Thus, any argument as to the seating of those members is waived. *See* Robert's Rules of Order, Ch.XIX, § 58. Finally, to the extent that a challenge existed in the form of a letter from certain members of the Alaska group, Secretary Mangia summarized the contents of that letter to the body which then validly and within its own power reached a decision as to the seating of those representatives.

45. Ultimately, this Court finds that the Party had a procedure to register

and/or credential members for the Nashville Meeting and followed that procedure. Since members of a political party have the ultimate right to self-determination, including the ability of a meeting of that party to register and/or credential its own members, this Court finds that the Nashville Meeting's removal of Gargan and Young was not invalid because delegates were not properly registered and/or credentialed.

## CONCLUSION

46. As a result of the actions of the Executive Committee at their meeting on December 28, 1999, Young was removed from the position of Convention Committee Chair/Treasurer. However, pursuant to action taken by National Party Chair Gargan in early January 2000, Young was duly re-appointed Chair/Treasurer of the Convention Committee. Art. VII, § 1(a). Young remained Convention Committee Chair/Treasurer until the National Committee recalled him and re-appointed Moan as Convention Committee Chair/Treasurer at the Nashville Meeting.

47. As a result of the actions of the National Committee at the Nashville Meeting, Gargan and Young were divested of any and all authority to represent themselves as the Reform Party's National Party Chair and Treasurer. While there was a dispute at the meeting about the definition of "two-thirds . . . of registered Members of the National Committee" as it relates to the removal of National Officers, this Court does not reach a decision on the meaning of that constitutional provision since both Gargan and Young were removed by 109 affirmative votes, which are more than is required under either definition. *See* Art. VIII, § 6(a).

48. At the Nashville Meeting, Choate was duly-elected as Interim National Party Chair and McLaughlin was duly-elected as Interim National Treasurer.

49. As a result of the actions of the National Committee at the Nashville Meeting, Choate and McLaughlin now possess the authority and are bound by the

duties conferred on the Reform Party National Party Chair and the Reform Party National Treasurer by the Reform Party constitution, its governing rules, and federal law.

50. Any actions taken by Gargan or Young, allegedly acting as National Officers of the Reform Party (with regard to the Las Vegas Convention or otherwise), since their removal as National Officers on February 12, 2000, were *ultra vires*, and without legal effect. Moreover, this Court finds that the Las Vegas Convention, held on March 17–19, 2000, was not a duly-constituted or properly convened Convention of the Reform Party of the United States of America, and any and all actions taken there are null and void as they relate to the Reform Party.

51. The Reform Party will suffer irreparable injury if Gargan and Young are not enjoined from acting as the authorized representatives of the Party.

52. There is no adequate remedy at law for the Reform Party.

### ORDER

For the reasons set forth in the attached Opinion, it is hereby ORDERED that John J. Gargan and Ronn Young, and their representatives, agents, servants, employees and attorneys, and any and all persons acting in concert with them, are hereby enjoined from acting as officers or authorized representatives of the Reform Party of the United States of America, including the Convention Committee, and shall hereby immediately cease and desist from any and all activities in such representative capacity, including, but not limited to: (1) solicitation of donations on behalf of the Reform Party of the United States of America, or the Convention Committee; (2) distribution of Press Releases on behalf of the Reform Party of the United States of America, or the Convention Committee;

(3) operation of an official web-site on behalf of the Reform Party of the United States of America, or the Convention Committee; (4) expenditure of funds on behalf of the Reform Party of the United States of America, or the Convention Committee; (5) solicitation of party members on behalf of the Reform Party of the United States of America; (6) organization of a national convention on behalf of the Reform Party of the United States of America, or the Convention Committee; (7) making any use of the name of the Reform Party of the United States of America, or the Convention Committee, or any substantially similar variant or derivation thereof; (8) making use of any logos, non-textual trademarks or service marks belonging to the Reform Party of the United States of America; and (9) making any other oral, written or electronic communication in a representative capacity on behalf of the Reform Party of the United States of America, or its Convention Committee.

Furthermore, it is hereby ORDERED that funds currently being held in the Registry of the Court, pursuant to prior order of this Court, will be released to the custody of Gerald Moan, as Chairman of the Convention Committee of the Reform Party of the United States of America. Since the Reform Party is under an obligation to comply with agreements filed pursuant to 11 C.F.R. § 9008.3(a)(1), this Court requires the Reform Party to acknowledge its obligations in writing to this Court prior to and as a condition of the release of any and all funds held in the Registry of the Court.[1] Upon release of the funds, the Reform Party shall deposit and maintain all funds released to them in a depository account properly registered with the Federal Election Commission, shall provide the Federal Election Commission with notice of any changes in the information provided in its application for federal funds that was submitted in September, 1999,

---

**1.** The Federal Election Commission filed an amicus brief without objection by either party. While the Commission did not take a position regarding who are the properly elected officers of the Reform Party, it did suggest that the Court include in its Order certain language regarding the legal obligations of the parties concerning the use of federal election funds. This Court has decided to adopt and integrate that language into this Order.

and shall specify to the Federal Election Commission the depository to which the United States Treasury should direct any supplemental payment of convention funds pursuant to 11 C.F.R. § 9008.5.

Furthermore, it is hereby ORDERED that John J. Gargan and Ronn Young shall turn over all documentation regarding convention funding and disbursements made by the Reform Party 2000 Convention Committee (or on its behalf) to the Reform Party of the United States of America, who are responsible under the Presidential Election Campaign Fund Act to provide all such information to the Federal Election Commission for any post-convention audit.

The Clerk of the Court is hereby directed to send a certified copy of this Order and attached Opinion to all counsel of record and to Stephen E. Hershkowitz, Assistant General Counsel, Federal Election Commission, 999 E Street, NW, Washington, DC 20463.