# O'BRIEN ET AL. v. BROWN ET AL.

Nos. 72–34 and A–23.  Decided July 7, 1972*

See: 152 U. S. App. D. C. 157, 469 F. 2d 563.

---

*Together with Nos. 72–35 and A–24, *Keane et al.* v. *National Democratic Party et al.*, on petition for writ of certiorari and on application for stay to the same court.

1

PER CURIAM.

Yesterday, July 6, 1972, the petitioners filed petitions for writs of certiorari to review judgments of the United States Court of Appeals for the District of Columbia Circuit in actions challenging the recommendations of the Credentials Committee of the 1972 Democratic National Convention regarding the seating of certain delegates to the convention that will meet three days hence.

In No. 72–35, the Credentials Committee recommended unseating 59 uncommitted delegates from Illinois on the ground, among others, that they had been elected in violation of the "slate-making" guideline adopted by the Democratic Party in 1971. A complaint challenging the Credentials Committee action was dismissed by the District Court. The Court of Appeals on review rejected the contentions of the unseated delegates that the action of the Committee violated their rights under the Constitution of the United States.

In No. 72–34, the Credentials Committee recommended unseating 151 of 271 delegates from California committed by California law to Senator George McGovern under that State's "winner-take-all" primary system. The Committee concluded that the winner-take-all system violated the mandate of the 1968 Democratic National Convention calling for reform in the party delegate selection process, even though such primaries had not been explicitly prohibited by the rules adopted by the party in 1971 to implement that mandate. A complaint challenging the Credentials Committee action was dismissed by the District Court. On review the Court of Appeals concluded that the action of the Credentials Committee in this case violated the Constitution of the United States.

Accompanying the petitions for certiorari were applications to stay the judgments of the Court of Appeals pending disposition of the petitions.

The petitions for certiorari present novel questions of importance to the litigants and to the political system under which national political parties nominate candidates for office and vote on their policies and programs. The particular actions of the Credentials Committee on which the Court of Appeals ruled are recommendations that have yet to be submitted to the National Convention of the Democratic Party. Absent judicial intervention, the Convention could decide to accept or reject, or accept with modification, the proposals of its Credentials Committee.

This Court is now asked to review these novel and important questions and to resolve them within the remaining days prior to the opening sessions of the convention now scheduled to be convened Monday, July 10, 1972.

The Court concludes it cannot in this limited time give to these issues the consideration warranted for final decision on the merits; we therefore take no action on the petitions for certiorari at this time.

The applications to stay the judgments of the Court of Appeals call for a weighing of three basic factors: (a) whether irreparable injury may occur absent a stay; (b) the probability that the Court of Appeals was in error in holding that the merits of these controversies were appropriate for decision by federal courts; and (c) the public interests that may be affected by the operation of the judgments of the Court of Appeals.

Absent a stay, the mandate of the Court of Appeals denies to the Democratic National Convention its traditional power to pass on the credentials of the California delegates in question. The grant of a stay, on the other hand, will not foreclose the Convention's giving the respective litigants in both cases the relief they sought in federal courts.

We must also consider the absence of authority supporting the action of the Court of Appeals in intervening in the internal determinations of a national political party, on the eve of its convention, regarding the seating of delegates.[1] No case is cited to us in which any federal court has undertaken to interject itself into the deliberative processes of a national political convention; no holding of this Court up to now gives support for judicial intervention in the circumstances presented here, involving as they do relationships of great delicacy that are essentially political in nature. Cf. *Luther* v. *Borden*, 7 How. 1 (1849). Judicial intervention in this area traditionally has been approached with great caution and restraint. See *Irish* v. *Democratic-Farmer-Labor Party of Minnesota*, 399 F. 2d 119 (CA8 1968), affirming 287 F. Supp. 794 (Minn. 1968), and cases cited; *Lynch* v. *Torquato*, 343 F. 2d 370 (CA3 1965); *Smith* v. *State Exec. Comm. of Dem. Party of Ga.*, 288 F. Supp. 371 (ND Ga. 1968). Cf. *Ray* v. *Blair*, 343 U. S. 214 (1952). It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. Highly important questions are presented concerning justiciability, whether the action of the Credentials Committee is state action and, if so, the reach of the Due Process Clause in this unique context. Vital rights of association guaranteed by the Constitution are also involved. While the Court is unwilling to undertake

[1] This is not a case in which claims are made that injury arises from invidious discrimination based on race in a primary contest within a single State. Cf. *Terry* v. *Adams*, 345 U. S. 461 (1953); *Smith* v. *Allwright*, 321 U. S. 649 (1944).

final resolution of the important constitutional questions presented without full briefing and argument and adequate opportunity for deliberation, we entertain grave doubts as to the action taken by the Court of Appeals.

In light of the availability of the convention as a forum to review the recommendations of the Credentials Committee, in which process the complaining parties might obtain the relief they have sought from the federal courts, the lack of precedent to support the extraordinary relief granted by the Court of Appeals, and the large public interest in allowing the political processes to function free from judicial supervision, we conclude the judgments of the Court of Appeals must be stayed.

We recognize that a stay of the Court of Appeals' judgments may well preclude any judicial review of the final action of the Democratic National Convention on the recommendation of its Credentials Committee. But, for nearly a century and a half the national political parties themselves have determined controversies regarding the seating of delegates to their conventions. If this system is to be altered by federal courts in the exercise of their extraordinary equity powers, it should not be done under the circumstances and time pressures surrounding the actions brought in the District Court, and the expedited review in the Court of Appeals and in this Court.[2]

The applications for stays of the judgments of the Court of Appeals are granted.

MR. JUSTICE BRENNAN is of the view that in the limited time available the Court cannot give these difficult and important questions consideration adequate for

---

[2] Argument was had and the case decided in the District Court on July 3; the Court of Appeals entered its judgment July 5. Papers were filed here July 6.

their proper resolution. He therefore concurs in the grant of the stays pending action by the Court on the petitions for certiorari.

MR. JUSTICE WHITE would deny the applications for stays.

MR. JUSTICE DOUGLAS, dissenting.

I would deny the stays and deny the petitions for certiorari. The grant of the stays is, with all respect, an abuse of the power to grant one. The petitions for certiorari will not be voted on until October, at which time everyone knows the cases will be moot. So the action granting the stays is an oblique and covert way of deciding the merits. If the merits are to be decided, the cases should be put down for argument. As MR. JUSTICE MARSHALL has shown, the questions are by no means frivolous. The lateness of the hour before the Convention and the apparently appropriate action by the Court of Appeals on the issues combine to make a denial of the stays and a denial of the petitions the only responsible action we should take without oral argument.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS joins, dissenting.

These two separate actions challenge the exclusion from the Democratic National Convention by the party's Credentials Committee of 151 delegates from the State of California and 59 delegates from the State of Illinois, all of whom were selected as delegates as a result of primary elections in their respective States. The excluded delegates allege, in essence, that the refusal of the party to accept them as delegates denies them due process, and denies the voters who elected them their

right to full participation in the electoral process as guaranteed by the United States Constitution.[1]

Two assertions are central to the challenge made by the delegates from California. First, they contend that under California's winner-take-all primary election law, which the Democratic Party explicitly approved prior to the 1972 primary election,[2] and which the California voters relied on in casting their ballots, they are validly elected delegates committed to the presidential candidacy of Senator George McGovern. Second, they claim that after all of the presidential candidates who were on the ballot in California had planned and carried out their campaigns relying on the validity of the State's election laws, and after all votes had been cast in the expectation that the winner of the primary would command the entire California delegation, the Credentials Committee changed the party's rules and reneged on the party's earlier approval of the California electoral system. The delegates contend that, in so doing, the committee and the party impaired the rights of both voters and duly elected delegates in violation of the Fourteenth Amendment.[3]

The Illinois delegates contend that they were excluded on the ground that they were "selected outside the arena of public participation by, and given the massive support and endorsement of, the Democratic organization in

---

[1] While the delegates couch their arguments in various ways, all of the arguments boil down to these two: i. e., they have been denied due process and the voters who elected them have been denied an opportunity to vote for the candidate or delegate of their choice.

[2] This approval was given in the form of a written communication from the Commission on Party Structure and Delegate Selection to the Democratic National Committeeman from California.

[3] A hearing officer found merit in the delegates' claims, but he was reversed by the Credentials Committee.

Chicago and specifically and clearly identifiable as the party apparatus in [certain districts], to the exclusion of other candidates not favored by the organization, and this without written and publicized rules and with no notice to the public such as would permit interested Democratic electors to participate."[4] They argue that the restrictions placed by the rules on party officials violate their rights under the First and Fourteenth Amendments. It is also suggested that another reason why the delegates were excluded was that their delegation had an insufficient number of Negroes, women, and representatives of certain other identifiable classes of persons. This is alleged to be establishment of a "quota" system in violation of the Fourteenth Amendment.[5]

The United States District Court for the District of Columbia denied both sets of plaintiffs relief on the ground that there was no justiciable question before it.[6] The United States Court of Appeals reversed the District Court and held that the questions presented in both suits were justiciable. It unanimously rejected the challenge made by the Illinois delegates, and by a 2–1 vote upheld the claim of the delegates from California that the belated change in the rules constituted a denial of due process of law.

The losing parties in the Court of Appeals seek review, and today this Court grants partial relief in the form of a stay of the judgments of the Court of Appeals. The Court holds, in effect, that even if the District

---

[4] Report of Hearing Officer 2, adopted by Credentials Committee, June 30, 1972.

[5] See Report of Hearing Officer 3–4.

[6] The District Court Judge indicated that, in his view, a quota system would raise serious constitutional questions. Two judges of the Court of Appeals found that the rules did not require any quotas. Judge MacKinnon disagreed, believing that the rules did establish a quota and that they were, therefore, unconstitutional.

Court was incorrect in ruling that the issues before it were "political questions" not properly justiciable in a court of law, the posture and timing of these cases require that federal courts defer to the Democratic National Convention for resolution of the underlying disputes. I cannot agree.

In each of these cases, the claim is made that the Credentials Committee has impaired the right of Democratic voters to have their votes counted in a presidential primary election. The related claim is also made that the committee has deprived the delegates themselves of their right to participate in the convention, by methods that deny them due process of law. Both these claims are entitled to judicial resolution, and now is the most appropriate time for them to be heard.

If these cases present justiciable controversies, then we are faced with a decision as to the most appropriate time to resolve them. There would appear to be three available choices: now; after the Credentials Committee's report is either accepted or rejected by the national convention; or after the convention is over.

There can be no doubt, in my view, that there is, at the present time, a live controversy between the excluded delegates and the Democratic National Committee. Nevertheless, because this controversy may vanish at the national convention, it is suggested that judicial intervention is premature at this point. This may be correct with respect to a decision on whether to grant injunctive relief, but not with respect to the appropriateness of a declaratory judgment.

Should this Court, or a lower federal court, be compelled to wait until the national convention makes a final decision on whether it will seat the delegates excluded by the Credentials Committee, it may never again be practicable to consider the important constitutional issues presented. Once the convention rules, we will

be faced with the Hobson's choice between refusing to hear the federal questions at all, or hearing them and possibly stopping the Democratic convention in midstream. This would be a far more serious intrusion into the democratic process than any we are asked to make at this time.

If we wait even longer—until the national convention is over—and ultimately sustain the delegates' claims on the merits, we would have no choice but to declare the convention null and void and to require that it be repeated. The dispute in these cases concerns the right to *participate* in the machinery to elect the President of the United States. If participation is denied, there is no possible way for the underlying disputes to become moot. The drastic remedy that delay might require should be avoided at all costs.

It is, therefore, obvious to me that now is the time for us to act. It is significant in this regard that the delegates request declaratory, as well as injunctive, relief. A declaratory judgment is a milder remedy than an injunction, cf. *Perez* v. *Ledesma,* 401 U. S. 82, 111 (1971) (BRENNAN, J., concurring in part and dissenting in part). It is a particularly appropriate remedy under these circumstances, because it can protect any constitutional rights that may be threatened at the same time that the premature issuance of an injunction is avoided. Hence, I believe that we should consider the prayer for declaratory relief and that we should do so now.

In granting the stays, then, the Court seems to rely at least in part on the view that the claims are not yet ripe for decision, a view which I cannot accept for the reasons stated above. In addition, the Court suggests that judicial relief will be inappropriate even after the full convention has ruled on these claims. The point appears to be that, quite apart from the mere matter of timing, the cases present a "political question,"

or are otherwise nonjusticiable, because they concern the internal decisionmaking of a political party. That argument misconceives the nature and the purpose of the doctrine. Half a century ago, Mr. Justice Holmes, writing for a unanimous Court, made it clear that a question is not "political," in the jurisdictional sense, merely because it involves the operations of a political party:

> "The objection that the subject matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years, since *Ashby* v. *White,* 2 Ld. Raym. 938, 3 *id.* 320, and has been recognized by this Court. *Wiley* v. *Sinkler,* 179 U. S. 58, 64, 65. *Giles* v. *Harris,* 189 U. S. 475, 485. See also Judicial Code, § 24 (11), (12), (14). Act of March 3, 1911, c. 231; 36 Stat. 1087, 1092. If the defendants' conduct was a wrong to the plaintiff the same reasons that allow a recovery for denying the plaintiff a vote at a final election allow it for denying a vote at the primary election that may determine the final result." *Nixon* v. *Herndon,* 273 U. S. 536, 540 (1927).

The doctrine of "political questions" was fashioned to deal with a very different problem, which has nothing to do with this case. As the Court said in *Baker* v. *Carr,* 369 U. S. 186 (1962), the basic characteristic of a political question is that its resolution would lead a court into conflict with one or more of the coordinate branches of government; courts decline to decide political questions out of deference to the separation of powers. 369 U. S., at 217; see *Powell* v. *McCormack,* 395 U. S. 486, 518–549 (1969). Neither the Executive nor the

Legislative Branch of Government purports to have juris-
diction over the claims asserted in these cases. Apart
from the judicial forum, only one other forum has been
suggested—the full convention of the National Demo-
cratic Party—and that is most assuredly not a coordi-
nate branch of government to which the federal courts
owe deference within the meaning of the separation of
powers or the political-question doctrine.

Moreover, it cannot be said that "judicially manage-
able standards" are lacking for the determinations re-
quired by these cases, 369 U. S., at 217. The Illinois
challenge requires the Court to determine whether cer-
tain rules adopted by the National Party for the selec-
tion of delegates violate the First and Fourteenth Amend-
ment rights of Illinois voters and, if the rules are valid,
whether they were correctly applied to the facts of the
case. The California challenge requires the Court to
determine whether the votes of party members were
counted in accordance with the rules announced prior
to the election and, if not, whether a change in the
rules after the election violates the constitutional rights
of the voters or the candidates. Both these determina-
tions are well within the range of questions regularly
presented to courts for decision, and capable of judicial
resolution.

A second threshold objection, however, has been raised
as an obstacle to judicial determination of these claims.
Even if the actions of a political party are not inherently
nonjusticiable, it is suggested that the Constitution
places few, if any, restrictions on the actions of a po-
litical party, and none of those restrictions are even
arguably implicated by any of the allegations here. On
this view, then, the plaintiffs below failed to state a
claim on which relief can be granted. I disagree.

1. First, I agree with the Court of Appeals that the
action of the Party in these cases was governmental

action, and therefore subject to the requirements of due process. The primary election was, by state law, the first step in a process designed to select a Democratic candidate for President; the State will include electors pledged to that candidate on the ballot in the general election. The State is intertwined in the process at every step, not only authorizing the primary but conducting it, and adopting its result for use in the general election. In these circumstances, the primary must be regarded as an integral part of the general election, see *United States* v. *Classic,* 313 U. S. 299 (1941), quoted *infra,* at 15–16, and the rules that regulate the primary must be held to the standards of elementary due process.

It is suggested that California, at least, cannot be charged with responsibility for the rules that are challenged here, because California by law sought (albeit unsuccessfully) to prohibit the Party from adopting those rules. That argument is somewhat disingenuous, however, unless it can seriously be contended that California will decline to recognize on its ballot in the general election the nominee of the Democratic convention. For so long as the State recognizes and adopts the fruits of the primary as it was actually conducted, then the State has made that primary an integral part of the election process, and infused the primary with state action, no matter how vociferously it may protest. A State cannot render the action of officials "private" and strip it of its character as state action, merely by disapproving that action. *Monroe* v. *Pape,* 365 U. S. 167, 172–187 (1961).

Thus, when the Party deprived the candidates of their status as delegates, it was obliged to do so in a manner consistent with the demands of due process. Because the Court does not reach the question, I likewise refrain from expressing my views on the merits of the due process challenge in either case. It is sufficient to say that beyond all

doubt, these claimants are entitled to a judicial resolution of their claim.

2. Even if the action of the Credentials Committee did not deny the delegates due process, petitioners in these cases claim that it impaired the federally protected right of voters to vote, and to have their votes counted, in the presidential primary election.[7]

It is, of course, well established that the Constitution protects the right to vote in federal or state elections without impairment on the basis of race or color, Const. Amdt. XV, or on the basis of any other invidious classification, *e. g., Baker* v. *Carr,* 369 U. S. 186 (1962); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972). With respect to federal elections, however, the right to vote enjoys a broader constitutional protection. In *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), Mr. Justice Black cited a long line of precedents for the proposition that Congress has ultimate supervisory power over all congressional elections, based on Art. I, § 4, of the Constitution. *E. g., Ex parte Siebold,* 100 U. S. 371 (1880); *Ex parte Yarbrough,* 110 U. S. 651 (1884); *United States* v. *Mosley,* 238 U. S. 383 (1915); *United States* v. *Classic, supra.* On the basis of these precedents, it is be-

---

[7] The alleged impairment of that right may be regarded as state action, as above, and hence subject to challenge under 42 U. S. C. § 1983. Alternatively, it may be regarded as the action of the. Federal Government, on the theory that Congress has the ultimate authority over presidential elections, and has acquiesced in the administration of the primary election process by the national political parties; in that case it may be subject to challenge on the theory of an implied remedy for a federal deprivation of constitutional rights, see *Bivens* v. *Six Unknown Agents,* 403 U. S. 388 (1971). Finally, it may be regarded as private action that interferes with a federally protected right; in that case the existence of a right of action may depend on the question whether the claims can be brought within the terms of 42 U. S. C. § 1985 (3), which protects certain federal rights against certain kinds of private interference, see *Griffin* v. *Breckenridge,* 403 U. S. 88 (1971).

yond dispute that the right to vote in congressional elections is a federally secured right.

Mr. Justice Black went on to argue that presidential elections have the same constitutional status: "It cannot be seriously contended that Congress has less power over the conduct of presidential elections than it has over congressional elections." 400 U. S., at 124. To support this conclusion, he relied on Art. II, § 1, and its judicial interpretation in *Burroughs* v. *United States,* 290 U. S. 534 (1934), and also on "the very concept of a supreme national government with national officers." 400 U. S., at 124 n. 7. On the basis of *Oregon* v. *Mitchell,* then, in which Mr. Justice Black's analysis was decisive, the right to vote in national elections, both congressional and presidential, is secured by the Federal Constitution.

Moreover, federal protection of the right to vote in federal elections extends not only to the general election, but to the primary election as well. In *United States* v. *Classic, supra,* this Court sustained an indictment charging a conspiracy "to injure and oppress citizens in the free exercise and enjoyment of rights and privileges secured to them by the Constitution and Laws of the United States, namely, (1) the right of qualified voters who cast their ballots in the primary election to have their ballots counted as cast for the candidate of their choice, and (2) the right of the candidates to run for the office of Congressman and to have the votes in favor of their nomination counted as cast." *Id.,* at 308. It was critical to the decision to hold, first, that the Constitution protects the right to vote in federal congressional elections, and, second, that the right to vote in the general election includes the right to vote in the primary.

> "Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the

> right of the elector to have his ballot counted at the primary is likewise included in the right protected by Article I, § 2. And this right of participation is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative." *Id.*, at 318.

That reasoning has equal force in the case of a presidential election. Where the primary is by law made an integral part of the election machinery, then the right to vote at that primary is protected just as is the right to vote at the election. In the cases before this Court, it is claimed that the presidential primary is an integral part of the election machinery, and that the right to vote in the presidential primary has been impaired. That claim should be heard and decided on its merits, certainly not by the use of the stay mechanism in lieu of granting certiorari and plenary consideration.

It is unfortunate that cases like these must be decided quickly or not at all, but sometimes that cannot be avoided. Where there are no substantial facts in dispute, and where the allegation is made that a right as fundamental as the right to participate in the process leading to the election of the President of the United States is threatened, I believe that our duty lies in making decisions, not avoiding them.

I would therefore deny the applications for stays.