**Gregorio IGARTUA DE LA ROSA, et al., Plaintiffs**

**v.**

**UNITED STATES of America, Defendant.**

No. CIV. 00–1421(JP).

United States District Court, D. Puerto Rico.

Aug. 29, 2000.

Gregorio Igartúa de la Rosa, Aguadilla, P.R., for Plaintiff.

Isabel Muñoz Acosta, Assistant United States Attorney, Hato Rey, P.R., David S. Mendel, U.S. Department of Justice, Civil Division, Washington, D.C., for Defendants.

### *FINAL JUDGMENT*

PIERAS, Senior District Judge.

Pursuant to the Final Opinion and Order entered on this same date, the Court hereby:

a. **FINDS** that the United States Citizens residing in Puerto Rico have the right to vote in Presidential elections and that its electoral votes must be counted in Congress;

b. **FINDS** that the Government of Puerto Rico has the obligation to organize the means by which the United States citizens residing in Puerto Rico will vote in the upcoming and subsequent Presidential elections and to provide for the appointment of Presidential electors and **ORDERS** the Government of Puerto Rico to act with all possible expediency to create such mechanism;

c. **ORDERS** the Government of Puerto Rico to inform the Court of all developments related to its implementa-

tion of the Presidential vote until the votes are counted pursuant to the Twelfth Amendment to the Constitution;

d. **DECLARES, ADJUDGES, AND DECREES** that Plaintiffs' claims against the United States based on the International Covenant on Civil and Political Rights, 6 I.L.M. 368 (1967) and Plaintiffs' challenge to the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff—1973ff-6 are hereby dismissed.

**IT IS SO ORDERED, ADJUDGED, AND DECREED.**

### FINAL OPINION AND ORDER

#### -I-

The Complaint in the instant action identifies the Plaintiffs as two groups of United States citizens residing in Puerto Rico who seek to vote in the upcoming and subsequent Presidential elections. The Plaintiffs in one group, composed of individuals who have always resided in Puerto Rico, argue that they have a right to vote in Presidential elections because they are U.S. citizens and, as such, are vested with the inherent power to vote for those who represent them. The second group is made up of former stateside residents who, while there, were eligible to vote in Presidential elections but became ineligible to do so upon taking up residence in Puerto Rico. Plaintiffs in both groups argue that the United States Constitution and the International Covenant on Civil and Political Rights, a treaty to which the United States is a party, guarantee their right to vote in Presidential elections. The second group also calls into question the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA" or "the Act"), 42 U.S.C. §§ 1973ff—1973ff-6, that allows United States citizens residing *outside* the United States to vote in federal elections as absentee voters in

their last State of residence. Under UOCAVA, Puerto Rico is considered to be within the United States. *See* 42 U.S.C. § 1973ff-6(6). Therefore, because its residents are inside the United States, they are not allowed to vote as absentee voters in federal elections under the Act.

On July 19, 2000, the Court entered an Opinion and Order (docket No. 17) ruling on the United States' motion to dismiss (docket No. 5). *See Igartúa de la Rosa v. United States*, 107 F.Supp.2d 140 (D.Puerto Rico 2000). In the opinion, the Court held that the United States citizens residing in Puerto Rico have the right to vote in Presidential elections and that Plaintiffs lacked a cause of action under UOCAVA and the International Covenant on Civil and Political Rights. On July 27, 2000, the Commonwealth of Puerto Rico and the Honorable Pedro Rosselló, in his official capacity as Governor of Puerto Rico, (collectively "the Government of Puerto Rico") filed a Motion to Intervene and Memorandum of Law pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure (docket No. 26), which the Court granted (docket No. 28). On August 1, 2000, the United States filed its answer to the Complaint (docket No. 29) raising the following affirmative defenses, to wit: 1) Plaintiffs lack standing to assert their claims because their injuries are not redressable, 2) Plaintiffs' claims are not justiciable as they present a political question, 3) Plaintiffs are barred from bringing the instant action by the principle of *res judicata,* and 4) the Complaint fails to state a claim upon which relief can be granted.

During a Status Conference held on August 1, 2000, the Court ordered Defendant United States of America to file proposed stipulations of fact to permit the Court to make a final disposition of the case at bar. Defendant has complied with the Court's order (docket No. 30) and all parties hereto have agreed to these stipulations of fact (docket Nos. 31, 33, & 36). On August 4, 2000, the Government of Puerto Rico filed a motion informing its agreement with the

Opinion and Order of July 19, 2000, accepting Defendant's proposed stipulations, informing its actions to implement the Court's July 19 ruling, and requesting injunctive relief (docket No. 33). Because the parties agree that there is no genuine issue of material fact and having submitted the instant case to the undersigned for final adjudication, the Court enters the following findings of fact.

### -II-

A. Co–Plaintiffs Gregorio Igartúa de la Rosa, Jorge Iván Rodríguez Feliciano, Victor Rodríguez Villanueva, Rafael Zeruto Soto, José Lausell González, Rafael Gutiérrez Torres, Héctor Ramos Vadi, Noel Pecunia Alvarez, and Jaime Bello Anazagasty assert in sworn affidavits attached to the Complaint that they were born in and are residents of Puerto Rico.

B. Co–Plaintiff Sonia del Carmen Gutiérrez Rodríguez asserts in a personal statement attached to the Complaint that she was born in and is a resident of Puerto Rico.

C. Co–Plaintiff Luis Pérez Thaureaux asserts in a sworn affidavit attached to the Complaint that he is a naturalized United States citizen and is a resident of Puerto Rico.

D. Defendant has no basis for disputing any of the above-described assertions made by the Plaintiffs.

E. Before the filing of the Complaint, Puerto Rico did not have any electors whose ballots were counted for the election of the President and Vice President pursuant to the procedures set forth in the Twelfth Amendment to the United States Constitution.

F. On April 19, 1991, the United States Department of Commerce, under cover of letter by Barbara Everitt Bryant, Director of the Bureau of the Census, sent to the Honorable Rafael Hernández Colón, Governor of Puerto Rico, the official 1990 census population counts indicating that the total population count for Puerto Rico is 3,522,037.[1]

G. The census data used to determine apportionment of the representatives among the States for purposes of the 2000 elections were the total population counts of each State from the 1990 decennial census. (The Court hereby takes notice of Defendant's Clarification of Plaintiffs' Notice of Stipulation (docket No. 40).)

In view of the findings of fact set forth above, the Court reaches the following conclusions of law.

### -III-

### A. Introduction

■ The instant opinion and order is the final adjudication of the merits of the case at bar. In view of the substantial discussion of the merits in its July 19, 2000, Opinion and Order, which are applicable to the conclusions herein, the Court hereby adopts and incorporates said Opinion and Order to form part hereof and to be read together herewith. In this Final Opinion and Order, the Court also considers the relevant constitutional provisions which relate to the case at bar, in particular whether Article II, section 1, clause 2 of the U.S. Constitution represents a roadblock for United States citizens residing in Puerto Rico from entering the Presidential ballot box. The Court also considers the affirmative defenses raised and briefed by the United States (docket Nos. 35, 37, & 38) and the manner in which relief will be implemented.

### B. Voting Versus Territoriality

Before the ratification of its first ten amendments, the U.S. Constitution did not

---

1. The United States has attached a copy of said letter to the motion at bar. Also attached to the motion is a letter dated May 6, 1991, from Fernando Lloveras San Miguel, Advisor to the Governor on Federal Affairs, acknowledging receipt of Ms. Bryant's April 19, 1991 letter.

speak of individual rights. *See* Daniel A. Farber, William N. Eskridge, Jr., & Philip P. Frickey, *Constitutional Law: Themes for the Constitution's Third Century* 5 (West 1993). For instance, the concepts of freedom of speech and due process do not arise from the seven Articles composing the Constitution of 1787. Rather, these freedoms are canvassed in the ten amendments ratified in 1791 which make up the Bill of Rights. The First Congress submitted these amendments to the States due to the concern some framers had for the need to guarantee individual liberties. *See* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 14.2 (3d ed.1999). Accordingly, a U.S. citizen and stateside resident's right to vote in Presidential elections is not derived from Article II, section 1, clause 2 ("Article II") but rather arises from the principles entrenched in the Bill of Rights.

■ Rather than bestowing a right, Article II deals with a question of federalism. The "difference between a federal and national government, as it relates to the *operation of the government* ... [is] that in the former the powers operate on the political bodies composing the Confederacy in their political capacities; in the latter, on the individual citizens composing the nation in their individual capacities. On trying the Constitution by this criterion, it falls under the national not the federal character." *The Federalist* No. 39 (James Madison). Therefore, the participation in Presidential elections does not hinge on the federal relationship between Puerto Rico and the federal government, but rather on the citizens' national right to vote.

The Supreme Court has stated in no uncertain terms that the right to vote constitutes a national right guaranteed by the principles of freedom of association as articulated in the First Amendment to the Constitution and protected by the Due Process and Equal Protection Clauses. *See Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Carter v. Dies*, 321 F.Supp. 1358, 1361 (D.Tex.1970) (holding that the right to vote is clearly fundamental and encompasses the rights to associate and speech and is protected by the Due Process and the Equal Protection Clauses). Moreover, the Supreme Court has gone a step further and stated that the election of the President and Vice President "implicate[s] a uniquely important *national* interest [because] the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (emphasis added). Hence, Article II does not grant those citizens residing in the United States any rights. The right to vote in Presidential elections would exist even if Article II were stricken from the text of the Constitution.

Congress has also recognized that the right to vote in Presidential elections flows from national citizenship, and does not hinge on questions of federalism. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. §§ 1973ff—1973ff-6, allows United States citizens residing outside the United States to vote in federal elections as absentee voters in their last State of residence. In this way, a citizen's right to vote in Presidential elections does not depend on his or her place of residence, but on his or her national citizenship. Under UOCAVA, a U.S. citizen, who formerly resided in Pennsylvania and now resides in Mozambique, for example, would be able to vote in federal elections as if he or she were a resident of Pennsylvania. Because the individual is no longer residing in the State, residency in a State is not dispositive of the right to vote in Presidential elections. It would be too limited a goal to propose that UOCAVA is protecting the rights of U.S. citizens as ex-residents of the States. Nothing guarantees that such individuals will return to their former State of residence. Therefore, it is their right as citi-

zens that the statute protects. If Article II conferred the right to vote in Presidential elections and sets its limits, as Defendant suggests, in order for U.S. citizens residing overseas to vote in Presidential elections, the Constitution would have to be amended. Thus, the Constitution does not have to be amended to allow the United States citizens residing in Puerto Rico to vote in Presidential elections.

Furthermore, the Twenty–Fourth and Twenty–Sixth Amendments support that the right to participate in Presidential elections is not a function of State residence, but rather an individual right of citizenship. The Twenty–Fourth Amendment states that "[t]he right of the *citizens of the United States* to vote in any primary or *other* election for President or Vice President, for electors for President or Vice President ... shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV (emphasis added). Although dealing with poll taxes, the Amendment does not speak of the right of the citizens residing *in the States*, but the right of the citizens *of the United States* to vote in primaries, the election of electors, and other elections for the President and Vice President. In similar manner, the Twenty–Sixth Amendment recognizes the national nature of the right to vote by stating "*[t]he right of citizens of the United States,* who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1 (emphasis added). Therefore, Article II cannot be read as a roadblock for the United States citizens residing in Puerto Rico to vote in Presidential elections, but rather as the constitutional articulation of the method by which voting is carried out in the States.

The Supreme Court has also recognized that territoriality is not determinative of a citizen's right to vote in the elections that affect him or her. In *Evans v. Cornman*,

398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), the Supreme Court declared unconstitutional Maryland's disenfranchisement of American citizens living on the grounds of the National Institutes of Health ("NIH"), a federal enclave in Maryland. In 1953, the State of Maryland donated the grounds of the NIH to Congress and pursuant to Article I, section 8, clause 17 Congress became empowered to "exercise exclusive Legislation in all Cases whatsoever" over the enclave. In 1963, the Maryland Supreme Court held that a resident of a federal enclave was not a resident of that State and therefore could not vote as a resident of Maryland. *See Royer v. Board of Election Supervisors*, 231 Md. 561, 191 A.2d 446 (1963). The United States Supreme Court held that the residents of the enclave had the right to vote as residents of Maryland. Although the *Evans* Court recognized that a federal enclave, like the District of Columbia and Puerto Rico, is subject to the power of Congress, such condition is unrelated to the right to vote. By keeping those living in the federal enclave from voting, the State of Maryland broke "the citizen's link to his laws and government"—a link which "is protective of all fundamental rights and privileges." *Evans*, 398 U.S. at 421, 90 S.Ct. 1752. The same holds true by excluding the United States citizens residing in Puerto Rico from the Presidential ballot box.

Although it could be argued that the *Evans* decision is distinguishable from the case at bar because the federal enclave is geographically in Maryland and Puerto Rico is not inside one of the States, this distinction is artificial. The Supreme Court stressed that what vests those living within the federal enclave with the right to vote is being subject to the laws of Maryland. *See id.* at 424–25, 90 S.Ct. 1752 ("In their day-to-day affairs, residents of the NIH grounds are just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as are their

neighbors who live off the enclave."). As in *Evans*, the United States citizens residing in Puerto Rico "have a stake equal to that of other [State] residents [and therefore] are entitled under the Fourteenth Amendment to protect that stake by exercising the equal right to vote." *Id.* at 426, 90 S.Ct. 1752. Therefore, the nature of the situs is irrelevant to determine if an individual can vote, and it is being subject to the laws of a government that vests a citizen with a stake in voting for that government.

■ The fact that Puerto Rico is subject to the Territorial Clause of the Constitution does not affect the fundamental right to vote of its residents. Under this clause, Congress has the "Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Although Congress has considerable power over its territories, it cannot limit "those fundamental limitations in favor of personal rights which were formulated in the Constitution and in its amendments." *Downes v. Bidwell*, 182 U.S. 244, 269, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). Congress cannot infringe these fundamental limitations because, "when the United States acts against citizens abroad it [cannot] do so free of the Bill of Rights. The United States is a creation of the Constitution. Its powers and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Reid v. Covert*, 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). By negating the United States citizens residing in Puerto Rico the right to vote, the Federal Government, particularly the Congress, would be acting outside its scope of authority and denying a right which flows from national citizenship. Furthermore, if the framers intended to deny the United States citizens residing in the territories the vote in Presidential elections, the correct place to establish that limitation would have been in the Territorial Clause. In-

stead, the clause speaks to "Rules and Regulations," not fundamental rights.

■ The Constitution's structure also stands as a testament that the right to vote is inherent in citizenship. The opening phrase of the United States Constitution is "We the People," not "We the Residents of the States" or "We the States," establishing that the document is not a covenant between the States, but rather an agreement of the People seeking to "secure the Blessings of Liberty to ourselves and our Posterity." U.S. Const. preamble. If the Constitution is a document which seeks to perfect the guarantees of liberty for the people and their posterity, the United States citizens residing in Puerto Rico became the People's "posterity" upon gaining citizenship under the Jones Act of 1917 and becoming natural born citizens by means of the Nationality Act, 8 U.S.C. § 1402. As such, they are secured with the blessings of liberty.

The Court understands the reasons for Article II's failure to explicitly incorporate territories to its text. The Constitution preexists the territorial relationship between Puerto Rico and the United States. Moreover, "[t]he Framers envisioned a uniform national system, rejecting the notion that the Nation was a collection of States, and instead creating a direct link between the National Government and the people of the States." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). Therefore, the use of the term "States" "can be best understood as specifying and using the most practical mechanisms available in the 18th century by which the people scattered among the several States could select their national representatives." *Adams v. Clinton*, 90 F.Supp.2d 35, 89 (D.D.C.2000) (Oberdorfer, J., concurring in part and dissenting in part). At the time of its ratification, the only political subdivisions capable of conducting national elections were the States. The District of Columbia was not created until 1800. Thus, the use of the term State in

Article II does not mean that the United States citizens of the territories could not cast their ballots in Presidential elections. The Article is the product of its time.

The use of the word "state" in the Constitution has evolved in understanding and meaning. Its use for purposes of the Full Faith and Credit Clause of the Constitution has not precluded Congress from. extending the concept to territorial application. *See* 28 U.S.C. § 1738. In the same way, Congress was not precluded from extending diversity of citizenship jurisdiction from applying to Puerto Rico despite that Article III of the Constitution vests federal courts with the jurisdiction to hear suits "between Citizens of different States." U.S. Const. art. III, § 2, cl. 1. Thus, because the Full Faith and Credit and Diversity of Citizenship Clauses are not hindrances for territorial applicability, it would be inconsistent to find that Article II is.

■■ Moreover, the fact that the Constitution does not state that United States citizens residing in Puerto Rico may vote in Presidential elections, does not create a presumption that such preeminent right does not exist. "The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Amendment guarantees individuals those rights inherent to citizenship in a democracy which are not enumerated in the Bill of Rights. *See United States v. Cook*, 311 F.Supp. 618, 619–620 (W.D.Pa.1970). In this way, the Ninth Amendment recognizes that the Constitution is not exhaustive in its listing of rights and that the *people* retain certain rights.

Further, the Supreme Court has acknowledged that certain rights which are not spelled out in the Constitution must be recognized in order to make the Constitution whole. In *Griswold v. Connecticut*, the Court recognized a personal right to privacy which was not articulated in so many words in the Constitution.

The association of people is not mentioned in the Constitution nor in the Bill of Rights. The right to educate a child in a school of the parents' choice— whether public or private or parochial— is also not mentioned. Nor is the right to study any particular subject or any foreign language. Yet the First Amendment has been construed to include certain of those rights. By *Pierce v. Society of Sisters*, *[*268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)*]* ... the right to educate one's children as one chooses is made applicable to the States by the force of the First and Fourteenth Amendments. By *Meyer v. State of Nebraska*, *[*262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)*]* ... the same dignity is given the right to study the German language in a private school. In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read ... and freedom of inquiry, freedom of thought, and freedom to teach ...—indeed the freedom of the entire university community.... Without those peripheral rights the specific rights would be less secure.

*Griswold v. Connecticut*, 381 U.S. 479, 482–483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). As in *Griswold*, not recognizing the right to vote in Presidential elections to the United States Citizens residing in Puerto Rico would make the principles of freedom entrenched in the Constitution void.

## C. Justiciability

Defendant argues that Plaintiffs lack standing to assert their claims because their injuries are not redressable. Defendant also argues that Plaintiffs' claim presents a political question, the adjudication of which would result in the infringement of the legislative power. The Court finds Defendant's arguments to be non-compel-

ling and hereby finds the claims to be justiciable.

■ Determining whether a plaintiff has a redressable claim represents an analysis subsumed within the concept of standing. The concept of standing is grounded on the principles of separation of powers. *See Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Requiring a plaintiff to have standing to bring suit ensures that there is a specific controversy before the court. *See Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Standing also ensures that courts "not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them or will be able to enjoy them regardless of whether the in-court litigant is successful or not." *Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Accordingly, Article III of the Constitution parts from the premise that the judiciary does not have "an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ In establishing standing, the plaintiff must show that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). A plaintiff must also allege that the injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751, 104 S.Ct. 3315. Redressability addresses whether the court's decision will make a difference, *see Warth v. Seldin*, 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and calls for the determination of whether the injury alleged is fairly traceable to the government conduct the plaintiffs challenge as unlawful. *See Allen*, 468 U.S. at 757, 104 S.Ct. 3315.

■ Plaintiffs have standing in the instant case. Their injury is not having their national right to vote in Presidential elections recognized and implemented. As stipulated by the parties, the United States citizens residing in Puerto Rico have not had any electors whose ballots are counted for the election of the President and Vice President pursuant to the procedures set forth in the Twelfth Amendment to the United States Constitution. Puerto Rico does not have electors to the electoral college and the United States has not recognized the legality of appointing such electors. In this way, there is a barrier that has been created by omission "which makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Northeastern Florida Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Florida*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). If Plaintiffs are correct, the Government of Puerto Rico has the constitutional duty to create the means by which to have the United States citizens residing in Puerto Rico vote in Presidential elections and Congress has the constitutional duty to count the electoral votes. *See Powell v. McCormack*, 395 U.S. 486, 517, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

The question that naturally surfaces from this discussion is whether the fact that United States citizens residing in Puerto Rico may vote in Presidential elections necessarily entails that their votes must be counted. After all, the election of the President and Vice–President is indirect and is described in the Twelfth Amendment to the Constitution. Plaintiffs seek, as part of their Complaint that, the Court order "all adequate remedies at law to protect plaintiffs voting rights in a rapid and effective manner." (Compl. at 39).

The Court notes that the Federal Rules of Civil Procedure do not require that a plaintiff request injunctive relief in the complaint in order to receive it.

Nevertheless, the United States asserts that it is impossible to mold an effective relief in this case because the judiciary may not issue an injunction compelling Congress to count the electoral votes in view of Constitutional principles such as the Speech and Debate Clause. The Court notes, however, that Plaintiffs also seek declaratory relief. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a district court may "declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." In this way, because there is an actual dispute, the Court may enter a declaratory judgment stating that the United States citizens residing in Puerto Rico may vote in Presidential elections to choose electors whose votes will be counted in Congress. *See Powell*, 395 U.S. at 518, 89 S.Ct. 1944.

### D. Political Question

▇▇▇ Defendant has also raised as a defense that Plaintiffs' Complaint is non-justiciable under the political question doctrine.[2] The Court disagrees with this contention. In *Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), the Supreme Court stated that "[c]ourts ought not to enter this political thicket." Subsequently, the Supreme Court stated:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable commit-

ment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691.[3] The Supreme Court has considered the political question doctrine as it applies to the republican form of government clause and the electoral process.

The Constitution states that "[t]he United States shall guarantee to every State in this Union a Republican form of government." U.S. Const. art. IV, § 4. Despite this language, the Supreme Court has found that challenges under the republican form of government clause are non-justiciable because if a State's government were declared unconstitutional, then all of its actions would be void and would result in chaos. *See Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849) (seminal case pertaining political question and republican form of government). The Supreme Court has been consistent in stating that claims challenging the republican form of government clause are non-justiciable. *See Pacific States Telephone & Telegraph Co. v.*

---

**2.** Defendant also alleges in its Answer to the Complaint as its third and fourth defenses, respectively, that Plaintiff Igartúa de la Rosa is barred from bringing this action under the principle of res judicata and that the Complaint fails to state a claim upon which relief can be granted. The Court already addressed these arguments in its Opinion and Order of July 19, 2000.

**3.** Professor Erwin Chemerinsky of the University of Southern California criticizes the reliance of the courts on this language as a standard for determining what constitutes a

political question. He states that there is "no place in the Constitution where the text states that the legislature or executive should decide whether a particular action constitutes a constitutional violation." Erwin Chemerinsky, *Federal Jurisdiction* § 2.6.1 (2d ed.1994). Neither does the Constitution limit judicial review to "textually demonstrable commitments" to the political branches of government. *See id.* According to Chemerinsky, the statement in *Baker* speaks of an elusive concept which is not meant to be applied as a litmus test to identify political questions.

*Oregon,* 223 U.S. 118, 151, 32 S.Ct. 224, 56 L.Ed. 377 (1912) (the issue before the Court was "political and governmental, and embraced within the scope of powers conferred upon Congress, and not therefore within the reach of judicial power"). This is not the challenge Plaintiffs assert.

The Supreme Court has consistently decided matters concerning the individual liberties of the United States citizens as set forth in the Bill of Rights in matters of race, segregation, and religion. These decisions have certainly expanded the application of the concept of the freedom of the individual for the betterment of the nation. The Supreme Court has considered as justiciable those cases where legislative reapportionment and gerrymandering have been called into question. *See, e.g., Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). In considering the reapportionment cases, the Supreme Court relied on the principle of one person, one vote as the cornerstone of American democracy and as a principle which prohibited the dilution of the minority vote. The Supreme Court also undertook the constitutionality of the concept of separate but equal in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. In view of this precedent, the Court cannot conceive that the instant case may be considered as posing a political question in which the Court should not intervene. There is no distinction between the instant case and the cases of gerrymandering, voting rights, and segregation insofar as justiciability is concerned. As in those cases, the instant case calls for the recognition of the existence of a fundamental right and its implementation.

In *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), the Supreme Court was called upon to decide what group of delegates should sit at the Democratic National Convention of 1972. The group of delegates had been excluded because they were not representative of racial minorities. The Supreme Court considered the claim to be non-justiciable

[i]n light of the availability of the convention as a forum to review the recommendations of the Credentials Committee, in which process the complaining parties might obtain the relief they have sought from the federal courts, the lack of precedent to support the extraordinary relief granted by the Court of Appeals, and the large public interest in allowing the political process to function free from judicial supervision.

*O'Brien,* 409 U.S. at 5, 92 S.Ct. 2718. Unlike *O'Brien* and by not having any real political clout, the United States citizens residing in Puerto Rico do not have a forum, besides the courts, where to bring these claims. It is precisely because of the unavailability of a political forum for the United States citizens residing in Puerto Rico that the Court must act to "strengthen the political system by assuring a higher level of fairness and responsiveness to the political process." *Gilligan v. Morgan,* 413 U.S. 1, 11, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). The goals of democracy have been substantially furthered by the judiciary, " 'especially under the equal protection clause in the apportionment cases and others which removed shackles on the exercise of the franchise.' " 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3534.1, n. 5 (2d ed.1984) (citing Choper, *Judicial Review and the National Political Process* 71–72, 127 (1980)). The fact that the colonial condition of Puerto Rico has remained unchanged for 102 years evidences the powerlessness of the United States citizens residing in Puerto Rico in the political branches.

Defendant has painted a scenario of judicial impotence by insisting that the appeal courts will not allow the United States citizens residing in Puerto Rico to vote in Presidential elections without a constitu-

tional amendment. The Court is of the opinion that it is more uphill to convince a court that, after 102 years of subjugation without representation, 83 of which have been as citizens, a distinct group of United States citizens may not vote in Presidential elections. The protection of civil rights is the business of the courts especially in the United States, a world power which has demanded from numerous other countries, and even threatened with the use of force, that they protect the freedoms of their citizens. The Constitution of the United States is a living document which accommodates itself to protect the rights and freedoms of its citizens. In view of this reality, how can a court say that it is without jurisdiction to protect the right of its citizens?

Congress' power over Presidential elections is limited. Article II, section 1, clause 3, is the only provision of the Constitution which explicitly addresses Congressional power over the popular election for Presidential electors. The Constitutional provision states that "[t]he Congress may determine the Time of [choosing] the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 3.[4] In this way, the citizenry of the United States gave very little power to the federal government in dictating the mechanism by which Presidential elections may be held.

The only other language in the Constitution regarding Congressional power in Presidential elections is found in its Twelfth Amendment. The Amendment states:

The Electors shall meet in their respective states and vote by ballot for President and Vice–President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice–President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice–President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice–President shall act as President, as in the case of the death or other constitutional disability of the President.—The person having the greatest number of votes as Vice–President, shall be the Vice–President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice–President; a quorum for the purpose shall consist of two-thirds of the whole number of Sena-

---

**4.** The Court notes, however, that the Supreme Court stated that Congress may also protect the presidential elections from fraud and corruption. *See Burroughs v. United States,* 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934).

tors, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice–President of the United States.

U.S. Const. Amend. XII.

The Amendment, however, does not grant Congress unlimited and unreviewable power to set the qualifications of the votes before it. Certainly, if Congress were to decide not to count the votes of the electors from New York, such action would not be immune from judicial review. Therefore, the Twelfth Amendment does not stand as a "textually demonstrable Constitutional commitment" of determining whether the votes from Puerto Rico or New York as such are to be counted. The Amendment, rather, sets forth a procedure in which the United States Citizens residing in Puerto Rico can participate.

The Amendment's use of the term "State" is not exclusive to the fifty States. This Amendment was ratified in 1804 before the inception and invention of the relationship between an unincorporated territory, like Puerto Rico, and the United States. If the Twelfth Amendment were to be read so strictly to only include States, the Constitutional right to participate in Presidential elections would be sabotaged by the Constitution itself. "It is ... settled beyond dispute that the Constitution is not self-destructive. In other words, that the powers which it confers on the one hand it does not immediately take away on the other." *Billings v. United States*, 232 U.S. 261, 282, 34 S.Ct. 421, 58 L.Ed. 596 (1914); *see also Lichter v. United States*, 334 U.S. 742, 781, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). Stating that the United States citizens residing in Puerto Rico may vote in Presidential elections, but that those votes cannot be counted because the appointment of Presidential electors has not been constitutionally mandated results in having the Constitution implode.

In view of the above, the Court finds that the instant case is justiciable and not subject to the political question doctrine.

**E. Injunctive Relief Against Congress**

 Defendant argues that this Court cannot order Congress to count the electoral votes that are transmitted by Puerto Rico to the "seat of the government" pursuant to the procedures set forth in the Twelfth Amendment. In particular, Defendant argues that because the responsibility for counting electoral votes rests with the President of the Senate and Congress, such task may not be subject to direct supervision by the Court. Defendant's arguments are premised on the assumption that the Court's conclusion of law that the United States citizens residing in Puerto Rico may participate in Presidential elections is incorrect. Although Defendant states by way of example that Congress' refusal to count the votes cast for Horace Greeley who died before the electoral college met to vote was within its discretion, the use of this example does not render the task of counting the votes presented by a State a discretionary one. If it were a discretionary act, Congress could pick and choose the states from which electoral votes would be counted. Clearly, if Congress decided not to count the votes from Tennessee or Texas, such omission would not be without judicial review and the validity of the election would certainly be constitutionally questionable.

 Although Defendant argues that the Court does not have jurisdiction over Congress due to the protection provided by the Speech and Debate Clause, such protection is applicable only when Congress acts pursuant to its legislative power. *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). "The purpose of the Clause is to ensure that the *legislative* function the Constitution allocates to Congress may be performed independently." *Id.* (emphasis added). The responsibility in question of counting votes

is derived from the Twelfth Amendment which amended Article II. Such Article pertains to the executive branch, not the legislative. By counting votes under Article II, no legislative 'function is taking place. In view of the above, the Court disagrees with Defendant's argument that injunctive relief could not be entered against the President of the Senate and the members of Congress due to the Speech and Debate Clause.

Even if the counting of electoral votes were a legislative act,

> [n]o legislative act, therefore, contrary to the Constitution, can be valid. To deny this would be to affirm that the deputy is greater than the principal; that the servant is above his master; that the representatives of the people are superior to the people themselves, that men acting by virtue of powers may not only do what their powers authorize, but what they forbid. If it be said that the legislative body are themselves the constitutional judges of their own powers and that the construction they put upon them is conclusive upon the other departments it may be answered that this cannot be the natural presumption where it is not to be collected from any particular provisions of the Constitution.... It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature in order, among other things to keep the latter within the limits assigned to their authority.

*The Federalist* No. 78 (Alexander Hamilton). The Court, however, will enter a declaratory judgment in accordance with this opinion and order that the United States citizens residing in Puerto Rico may vote in Presidential elections and that their votes must be counted in Congress.

## F. Local Implementation

■ In view that the President and Vice President are elected via the electoral college system and that the appointment of Presidential electors is not left up to the Federal Government, the Government of Puerto Rico has the obligation as hereby ordered by this Court to provide for the designation of presidential electors so as to funnel the popular vote of the United States citizens residing in Puerto Rico into electoral votes for the upcoming and subsequent Presidential elections. These electoral votes shall be signed and certified, and transmitted sealed to the seat of the Government of the United States, directed to the President of the Senate, and counted pursuant to the procedure set forth in the Twelfth Amendment to the United States Constitution. The Court will retain jurisdiction of this matter and hereby **ORDERS** the Government of Puerto Rico to inform the Court of all developments related to the implementation of the Presidential vote until all the electoral votes are counted as prescribed in the Twelfth Amendment.

The Court notes that the steps the Government of Puerto Rico and the Puerto Rico Legislature take in furtherance of establishing the means by which to implement the Presidential vote for the United States citizens residing in Puerto Rico do not violate the pronouncements made by the Puerto Rico Supreme Court in *Partido Socialista Puertorriqueño v. Estado Libre Asociado De Puerto Rico*, 107 P.R. Dec. 590, 1978 WL 48833 (1978). In *Partido Socialista Puertorriqueño*, the Court held that the Constitution of Puerto Rico does not provide adequate legal grounds for the determination that financing the possible development of a particular political status for which funds were allocated could be construed as a public purpose. *See Partido Socialista Puertorriqueño*, 107 P.R. Dec. at 606–607, 1978 WL 48833. Voting is inherent to citizenship, not political status, and therefore recognizing that United States citizens residing in Puerto Rico may vote in Presidential elections and the implementation of such right does not alter or tend to alter the political status of Puerto Rico. The people of Puerto Rico obtained U.S. citizenship in 1917 and became

natural born citizens under the Nationality Act. The Legislature and Government of Puerto Rico by recognizing and implementing the decision in the case of caption would not be altering the status of Puerto Rico. These bodies would be acting pursuant to the Constitution of the United States of America. To establish that Puerto Rico's political status changes with the implementation of the Presidential vote would suggest that the political status of foreign countries changed with the enactment of UOCAVA, which recognizes the right of United States citizens residing abroad to vote in their last State of residence.

### -IV-

In view of the foregoing and because in the land of the free freedom shall prevail, the Court hereby:

1) **FINDS** that the United States Citizens residing in Puerto Rico have the right to vote in Presidential elections and that its electoral votes must be counted in Congress;

2) **FINDS** that the Government of Puerto Rico has the obligation to organize the means by which the United States citizens residing in Puerto Rico will vote in the upcoming and subsequent Presidential elections and to provide for the appointment of Presidential electors and **ORDERS** the Government of Puerto Rico to act with all possible expediency to create such mechanism;

3) **ORDERS** the Government of Puerto Rico to inform the Court of all developments related to its implementation of the Presidential vote until the votes are counted pursuant to the Twelfth Amendment to the Constitution.

**IT IS SO ORDERED.**